695 F.2d 465
 19 ERC 1443
 CITY AND COUNTY OF DENVER, Acting By and Through its BOARD
OF WATER COMMISSIONERS, Plaintiff-Appellant,
and
Mountain States Legal Foundation, Plaintiff-Intervenor,
v.
Robert BERGLAND, Secretary of the United States Department
of Agriculture, John R. McGuire, Chief, United States Forest
Service, Craig W. Rupp, Regional Forester, Rocky Mountain
Region, United States Forest Service; Cecil D. Andrus,
Secretary of the United States Department of the Interior;
Dale D. Andrus, State Director, Bureau of Land Management of
the Department of the Interior, and the United States of
America, Defendants-Appellees,
and
Sierra Club; American Wilderness Alliance; and the Board
of County Commissioners of the County of Grand,
Colorado, Defendants-Intervenors Appellees.
 No. 81-1852.
 United States Court of Appeals,
Tenth Circuit.
 Dec. 9, 1982.
 
 Wayne D. Williams, Denver, Colo. (Michael L. Walker, Henry C. Teigen and Maurice Lyle Dechant, Denver, Colo., with him on brief), for plaintiff-appellant.
 Robert L. Klarquist, Atty., Dept. of Justice, Washington, D.C. (Carol E. Dinkins, Asst. Atty. Gen., Washington, D.C., Robert N. Miller, U.S. Atty., Denver, Colo., Michael J. Gippert, Atty., Dept. of Agriculture, Denver, Colo., and Edward J. Shawaker, Atty., Dept. of Justice, Washington, D.C., with him on brief), for defendants-appellees.
 H. Anthony Ruckel, Denver, Colo., for defendant-intervenor appellee Sierra Club.
 Henry W. Ipsen, Denver, Colo. (Charles B. White of Kirkland & Ellis, Denver, Colo., and Gerald E. Dahl, Frisco, Colo., with him on the brief), of Kirkland & Ellis, Denver, Colo., for defendants-intervenors appellees Bd. of County Com'rs of the County of Grand, Colorado.
 Before McWILLIAMS, BARRETT and SEYMOUR, Circuit Judges.
 BARRETT, Circuit Judge.
 
 
 1
 This appeal involves a right of way owned by appellant, the Denver Water Board (Denver), across federal lands managed by appellee, the United States Forest Service (USFS). The right of way was granted for canals on a certain alignment. Denver actually constructed a part of its project with steel conduits which followed a different alignment, and plans to continue the project with conduits on the new alignment. The USFS determined that both the conduits and the new alignment constituted deviations from the right of way as granted and ordered Denver to halt construction until it obtained further authorization from the USFS and complied with other conditions. Denver sought judicial review of those decisions in the federal district court for the District of Colorado, 517 F.Supp. 155. Denver also sought to quiet title to the right of way and to obtain compensation for a taking under the Fifth Amendment. The district court upheld the orders of the USFS and dismissed the other actions for lack of subject matter jurisdiction. Denver brings this appeal. The controlling issues are whether the USFS had the authority to take any action on Denver's right of way, and whether Denver is indeed beyond the scope of its right of way grant.
 
 FACTUAL BACKGROUND
 
 2
 The City of Denver is located on the eastern side of the Continental Divide in the South Platte River drainage basin. For many years now, all of the available water in that drainage has been appropriated completely. As a result, and as a result of its continued growth, Denver has developed several projects to transport water from the western side of the Continental Divide into the South Platte drainage. One of those projects is the Williams Fork Diversion Project, which was intended to convey water from the Williams Fork drainage, west of the Continental Divide, through canals and tunnels into the drainage of Clear Creek, east of the Continental Divide, where the water could become part of Denver's municipal water supply system.
 
 
 3
 The area in which Denver planned to collect, divert, and transport the water lay within Arapahoe National Forest, almost wholly within Grand County, Colorado. To build its reservoirs, canals, and tunnels Denver needed a right of way across the national forest lands. On February 11, 1922, Denver filed an application for a right of way under the acts of March 3, 1891, 26 Stat. 1095, 1101; May 11, 1898, 30 Stat. 404; and February 1, 1905, 33 Stat. 628. On June 13, 1923, the General Land Office of the Department of the Interior dismissed the application because the various acts authorized rights of way for different purposes and types of grantees. Thus, Denver could not qualify under all three acts at the same time. Denver submitted an amended application on December 12, 1923, pursuant only to the act of February 1, 1905.
 
 The 1905 act provided:
 
 4
 SEC. 4. That rights of way for the construction and maintenance of dams, reservoirs, water plants, ditches, flumes, pipes, tunnels, and canals, within and across the forest reserves of the United States, are hereby granted to citizens and corporations of the United States for municipal or mining purposes, and for the purposes of the milling and reduction of ores, during the period of their beneficial use, under such rules and regulations as may be prescribed by the Secretary of the Interior, and subject to the laws of the State or Territory in which said reserves are respectively situated.
 
 
 5
 Pub.L. No. 58-34, Sec. 4, 33 Stat. 628 (1905), 16 U.S.C. Sec. 524 (1976), partially repealed by Federal Land Policy and Management Act of 1976, Pub.L. No. 94-579, Title VII, Sec. 706(a), 90 Stat. 2743, 2793 (1978). Thus, the Secretary of the Interior, not the USFS, was charged with the granting and administration of Denver's right of way.
 
 
 6
 Under the authority granted by the act, the Secretary of the Interior immediately promulgated regulations establishing the procedure for filing applications. 33 Pub.Lands Dec. 451-53 (1905). These regulations explicitly incorporated by reference certain regulations issued under the General Right of Way Act of 1891, 26 Stat. 1095, 1101, 43 U.S.C. Secs. 946-949 (1976), partially repealed by Federal Land Policy and Management Act of 1976, supra, Sec. 706(a). The regulations in effect when Denver applied for its right of way in 1923 can be found at 36 Pub.Lands Dec. 584-86 and 567-574 (1908).[1] In essence, the regulations required an applicant to submit accurate survey field notes and maps showing the definite location and extent of the proposed project that required the right of way.
 
 
 7
 Denver's amended application was submitted in conformance with the regulations. The application consisted of field notes of a survey conducted by George M. Bull, a prominent engineer and surveyor, and a map accurately reflecting those notes. On the map, in accordance with the regulations, was a sworn statement by Mr. Bull that a survey was made under his direction, beginning on March 21, 1914, and completed on September 1, 1921, and that the "survey accurately represents a proper grade line for the flow of water which is the proposed line of said canals and that said survey is accurately represented upon this map and by the accompanying field notes...." [Joint App., Vol. III, p. 326]. Also on the map, and pursuant to the regulations, was a sworn statement by Frank L. Woodward, the president of the Denver Water Board at that time, that the Board had adopted the survey of the canals and tunnels "as accurately represented on this map and by the accompanying field notes" as the location of the proposed canals and tunnels. [Joint App., Vol. III, p. 326].
 
 
 8
 The Secretary of the Interior inquired of the USFS whether it had any objection to the approval of Denver's application. The USFS and Denver thereafter executed stipulations for the protection of the national forest. On May 5, 1924, under Section 4 of the act of 1905, the Secretary of the Interior approved Denver's application, consisting only of field notes, map, and affidavits, subject to those stipulations. Denver thereby obtained a right of way across national forest lands, identified as Denver (or D)-27915, subject to the limitation of beneficial use, and the regulations of the Department of the Interior (Interior).
 
 
 9
 Between 1924 and 1929 Denver did not begin any actual construction on the right of way. Although the 1905 act contained no provision for construction within a specific period of time, prior right of way acts, such as the General Right of Way Act of 1891, supra, required construction within five years of the date of approval. Consequently, the Interior decided that five years was a reasonable period of time within which to construct and put to beneficial use any project approved under the act. Denver had filed no evidence of construction, so the Interior directed Denver to file proof that the project had been constructed in substantial compliance with the approved map and was being put to beneficial use, or to show cause why the Interior should not institute a judicial proceeding to cancel the grant.
 
 
 10
 On July 26, 1929, Denver filed its "Answer Showing Cause Why Cancellation of the Grant Herein Should not be Recommended", relating that Denver was planning to construct three transmountain diversion projects, of which the Williams Fork Project was one, and was unsure which project would first be constructed, though all three were considered necessary. The Interior accepted the show cause report and suspended further action regarding cancellation of the right of way until January 1, 1931. This was the first "show cause" or "progress" report of the many that were routinely required, filed, and accepted through Denver's thirty-seventh such report, dated December 9, 1975. All of these reports were forwarded to the USFS, which routinely recommended their approval.
 
 
 11
 Denver did not commence actual construction of the Williams Fork Project until 1937. Between 1937 and 1940, Denver constructed a three-mile long tunnel under Jones Pass, approximately one and one-half miles of its North Canal Line between the west portal of the tunnel and McQueary Creek, and a little over one and one-half miles of its South Canal Line between the west portal of the tunnel and a point just beyond Steelman Creek in the Williams Fork Basin. The total project, as approved in 1924, consisted of 17.38 miles of canals and 3.73 miles of tunnels. The construction utilized buried steel conduits, not open canals, and the south canal line followed a grade and center line alignment different from that shown on the survey map upon which the right of way was granted. These alterations were undertaken to improve the overall efficiency and economy of the project. In essence, the new alignment on the south canal line followed a course parallel to the original alignment, but at a higher elevation. This alignment deviated from the original, approved, alignment by varying amounts up to 1800 horizontal feet and 65 vertical feet.
 
 
 12
 Part of the funds for the construction between 1937 and 1940 were provided by the Federal Public Works Administration (PWA). The state, and later, regional director of the PWA during that time was George Bull, the same person who supervised Denver's original survey. The PWA was authorized by the Industrial Recovery Act of 1933, Pub.L. No. 73-67, Secs. 201-207, 48 Stat. 195, 200 (1934). The primary purpose of the PWA was to increase employment by providing for useful projects during the depression of the 1930's. The PWA approved the use of its funds on the Williams Fork Project.
 
 
 13
 From 1942 to 1978 there was no significant construction on the Williams Fork Project. During that time period, however, Denver was actively engaged in construction upon its other transmountain diversion projects, including the Fraser River Diversion Project, which also utilized a right of way granted under the 1905 act. Denver planned to do substantial work on that project in the field season of 1955. The USFS, however, discovered that much of the construction on the project deviated from the original alignment. Apparently Denver had been securing special use permits from the USFS which ostensibly authorized the deviations. The USFS determined that such a procedure had been erroneous; instead, Denver should have filed an amended map with the Interior in order to revise the right of way before any construction occurred. On March 27, 1955, the USFS informed Denver that it must file its new plans and maps for further construction with the Interior as an amendment to the existing 1922 easement. Additionally, the amended filing was required to show how the constructed portions deviated from the original right of way.
 
 
 14
 The USFS indicated that it had no authority to allow construction outside of the original right of way prior to the time Denver applied for an amended right of way, but that it could issue an interim permit allowing Denver to begin construction while the amended application was being approved by Interior. Denver complied on April 20, 1955, submitting new maps and entering into new stipulations with the USFS concerning the changed damages to national forest land. Denver was anxious to start construction. However, the USFS reiterated that it had no authority to allow construction until the amended right of way was issued or the Interior authorized the USFS to issue an interim permit. On June 10, 1955, less than two months after Denver filed its amended map, and in time for the construction season, the Interior issued a revised right of way pursuant to the 1905 act and the appropriate regulations.
 
 
 15
 The Interior's policy of requiring amended applications prior to construction substantially deviating from the right of way was made explicit in 1975 when the following regulation was adopted:
 
 
 16
 No deviation from the location of an approved right-of-way shall be undertaken without the prior written approval of the authorized officer [an officer of the proper Bureau of Land Management district office]. The authorized officer may require the filing of an amended application ... wherein the authorized officer's judgment the deviation is substantial.[2]
 
 
 17
 40 Fed.Reg. 17,844 (1975) (previously codified at 43 C.F.R. Sec. 2802.2-4, removed at 45 Fed.Reg. 44,537 (1980)).
 
 
 18
 Several other events of significance occurred during the hiatus in construction on the Williams Fork right of way between 1942 and 1978. In 1955, the "Blue River Decree" was entered in United States of America v. Northern Colorado Water Conservancy District, Civ. Nos. 2782, 5016, 5017 (D.Colo. October 12, 1955). The decree established the priorities to the use of the waters of the Blue River among the cities of Denver, Colorado Springs, and Englewood and the United States. In addition, it quieted title to ownership of the water rights among the parties. In its findings of fact and conclusions of law in the case, the district court incorporated a stipulation among the parties recognizing Denver's conditional priority of July 4, 1921, for its Williams Fork Diversion Project. In turn, the stipulation was incorporated into the final decree, establishing Denver's priority of use, and quieting title to its rights of use, of the waters in the Williams Fork Diversion Project between it and the United States. The decree was approved by Congress in the Colorado River Storage Project and Participating Projects Act of 1956, and agencies of the United States were ordered to act in accordance with it. Pub.L. No. 84-485, Sec. 11, 70 Stat. 105, 110 (1957), 43 U.S.C. Sec. 620j (1976).
 
 
 19
 In 1969 Congress enacted the National Environmental Policy Act (NEPA), 42 U.S.C. Secs. 4321-4361 (1976). NEPA requires the federal government to use all practicable means to carry out the policies of protecting and preserving the environment. The Interior and the USFS are subject to NEPA; accordingly, the USFS began to study, and requested that Denver consider, various alternatives to Denver's planned Williams Fork Diversion Project. Denver did so, but eventually decided simply to continue construction of the existing project.
 
 
 20
 In 1976, Congress enacted the Federal Land Policy and Management Act of 1976 (FLPMA), Pub.L. No. 94-579, 90 Stat. 2743 (1978), 43 U.S.C. Secs. 1701-1782 (1976). Subchapter V, 43 U.S.C. Secs. 1761-1771 (1976), addresses rights of way across national forest lands, giving the authority to grant, issue, or renew such rights of way to the Secretary of Agriculture. 43 U.S.C. Sec. 1761(a) (1976). Section 706(a) of the act repealed the act of 1905 insofar as it dealt with the issuance of rights of way across national forest lands. 90 Stat. 2793. Section 701 expressly provides that "[n]othing in [FLPMA] ... shall be construed as terminating any valid ... right-of-way ... existing on the date of approval of this Act." 90 Stat. 2786. Further, section 509 of FLPMA, 43 U.S.C. Sec. 1769 (1976), states that "[n]othing in this subchapter [V] shall have the effect of terminating any right-of-way ... heretofore issued, granted, or permitted."
 
 
 21
 During the 1970's, the USFS conducted environmental assessments in the Williams Fork area and determined that the area had high quality environmental values which would be damaged by the continued construction of Denver's Williams Fork Project. In fact, as a roadless area, the Williams Fork area was under consideration for inclusion in the nation's wilderness preservation system, although the USFS recognized Denver's right of way as a legal encumbrance on the forest land.[3] Because of these planning and management concerns, the USFS attempted to persuade Denver to build one of two alternative collection systems, rather than the original Williams Fork Project. In response to the requests of the USFS, Denver submitted two special use permit applications to USFS for the construction of the alternatives.
 
 
 22
 After it received Denver's applications, the USFS wrote a letter, dated April 11, 1977, to the Interior stating that additional development of Denver's authorized right of way would cause considerable resource damage and that either of the two alternatives would be environmentally superior to continued construction on the existing right of way. Further, the USFS decided that "the relatively minor amount of canal work actually completed and the submission of Special Use Applications for alternate collection and transmission systems ... constitutes abandonment of right-of-way D-027915." [Joint App., Vol. IV, p. 774]. It requested that because of this "abandonment" the Bureau of Land Management (BLM) "take whatever steps are necessary to secure a relinquishment of the unconstructed portion of right-of-way, D-027915."[4] [Id. at 775]. In accordance with that request, the BLM issued to Denver a notice to show cause as to why an order suspending the right to use its right of way should not be issued. In that notice, BLM contended that Denver had not put its right of way to beneficial use in a reasonable time, and that Denver's filing of special use permit applications with the USFS indicated an intent to abandon the unconstructed portion of the right of ways.
 
 
 23
 Denver's response to the notice, dated May 27, 1977, challenged the BLM's authority to suspend a "vested" right, but nevertheless presented evidence of money Denver had spent and what construction it had completed. Denver also pointed out that it had filed the special use applications in an attempt to cooperate with the USFS, and only at its request, so that the application in no way represented an intent to abandon the original right of way.
 
 
 24
 The BLM responded on June 21, 1977, by asserting that it did have the statutory duty and power to seek termination for failure to put a right of way grant to beneficial use. Based on Denver's letter in response to the notice to show cause, however, the BLM stated that "it appears that the Board at this time is complying with [the Act of February 1, 1905]...." [Joint App., Vol. IV, p. 787]. This finding was a narrow one, limited only to the issue before the BLM: whether Denver had abandoned the original right of way by failing to construct the project more rapidly and filing the special use applications. The trial court found that the BLM's approval of Denver's letter showing cause why suspension should not be ordered did not in any way sanction Denver's deviations from the approved right of way. The BLM simply was convinced by Denver that it did not intend to abandon the right of way.
 
 ADMINISTRATIVE ACTION
 A. Canals versus Conduits
 
 25
 In July of 1978, Denver resumed construction on the Williams Fork Project. Members of the USFS met on August 17, 1978, and determined that construction with closed conduit was not authorized under the original grant of a right of way for "canals". On August 23, 1978, Craig Rupp, the USFS's Regional Forester, wrote a letter informing Denver of that decision and directing it not to begin any operations not specifically related to "canals and tunnels" until it applied for and received a new right of way. Approval of the new right of way would require the USFS to prepare an Environmental Assessment Report (EAR) under NEPA, and would be subject to the requirements of FLPMA.
 
 
 26
 Denver responded that the distinction between "canal" and "conduit" was an artificial one; as long as it was fulfilling the purposes of its grant, Denver argued, it was within the scope of the grant. Further, Denver contended that since it was within the scope of its grant, no federal action or supervision was necessary; thus, NEPA was not triggered. Consequently, Denver asserted that it intended to continue construction.
 
 
 27
 On October 6, 1978, Rupp requested that Denver submit complete plans for its Williams Fork Project so that the USFS could assess whether any further permits would be necessary. He also sought confirmation that all work was related directly to the right of way as authorized. On October 9, Denver responded by stating that it had not yet developed complete plans for the Williams Fork Project.[5]
 
 
 28
 On October 19, 1978, Rupp informed Denver that the change from canals to conduits required an amendment to the original right of way. The decision further stated that FLPMA had repealed the 1905 act, so that no change from the 1924 right of way could be authorized except by compliance with FLPMA and NEPA. Denver appealed the decision to the Chief of the Forest Service on November 9, 1978, seeking withdrawal of the decision and a decision that closed conduit construction was within the authorization of the 1924 grant. On February 13, 1979, John R. McGuire, the Chief of the Forest Service, dismissed Denver's appeal for lack of timeliness. Denver sought reconsideration of this decision, but that request was denied. Thus, the February 13, 1979, decision constituted the final decision by the Department of Agriculture that closed conduit construction was outside the scope of the 1924 right of way grant.
 
 B. Alignment
 
 29
 Meanwhile, on December 4, 1978, Denver submitted partial plans and maps to the USFS concerning its Williams Fork Project. The district court found that this was the first time that the USFS was notified that Denver had built on an alignment different from that which was originally authorized. The USFS reviewed Denver's plans and on January 5, 1979, it informed Denver that the proposed plans indicated considerable deviations from the original grant and that Denver was causing substantial environmental damage through its construction activities. It ordered Denver to stop construction immediately until measures could be taken to mitigate environmental damage and until Denver submitted proof that it was constructing on the alignment of the original grant.
 
 
 30
 On January 12, 1979, the Regional Forester supplemented the decision and issued a formal stop order. The stop order required Denver to halt construction on the Williams Fork Project until the USFS and all other federal, state, or county agencies with jurisdiction approved further work and certain conditions were satisfied.
 
 
 31
 Denver appealed that decision to the Chief of the Forest Service on February 14, 1979, requesting withdrawal of the stop order. The Commissioners of Grand County and the Sierra Club were allowed to intervene in the appeal. In the appeal Denver contended that it could not construct a gravity collection system on the original alignment; instead, it was committed to continue upon the alignment established by the 1937-40 construction. There was, Denver maintained, no deviation from the "collection system concept". The Chief entered his decision on May 8, 1979, ruling that Denver indeed had deviated from the original alignment. He found that the regulations, 43 C.F.R. 2802.2-4 (1979), supra, preventing deviations without prior approval, and 43 C.F.R. 2802.2-1(b) (1979), requiring the BLM to consult with and obtain the consent of other agencies when a proposed right of way crossed their land, required Denver to obtain the approval of the USFS for further deviations. The Chief held that because of FLPMA, only the USFS had authority to authorize deviations from rights of way over national forest lands. Denver was ordered not to resume work until it met the following conditions: (1) submission of plans of construction to the USFS for approval; (2) completion of an EAR; and, (3) issuance of authorization to proceed by the USFS. The Secretary of Agriculture declined to review the decision of the Chief.
 
 DISTRICT COURT
 
 32
 On May 23, 1979, Denver filed the present action, seeking judicial review of both the administrative decisions, "canals versus conduits" and "alignment". On June 12, 1979, the Chief revised his May 8 "alignment" decision, because Denver's action in filing suit clarified its position. Among other things, the revised order required: (1) that Denver submit complete plans for its Williams Fork Project to the USFS for approval under FLPMA; (2) that the USFS prepare an EAR; (3) that Denver obtain any other required federal or state authorizations; and (4) that the effect of the project on the RARE II further planning area be considered. The Secretary of Agriculture again declined to review the decision. The revised decision is therefore the final agency action for purposes of review.
 
 
 33
 Meanwhile, Denver was planning to resume construction activities on the 1924 right of way. The USFS requested that Denver apply for special use permits, but Denver declined, maintaining that its activities were authorized by the original right of way. On June 28, 1979, the Department of Justice informed Denver that without a special use permit, any activity beyond the limitations of the 1924 right of way would be considered a trespass upon federal lands. Nevertheless, without obtaining any new permits, Denver attempted to resume construction on July 9, 1979. Representatives of the USFS were present at the construction site and concluded that Denver's activities were in violation of the January 12 stop order and the June 12 revised decision. They also determined that the construction was located beyond the 1924 right of way, and constituted a trespass on federal lands. They ordered Denver to cease construction. Denver complied.
 
 
 34
 On July 10, 1979, Denver filed a motion for a temporary restraining order and preliminary injunction to prevent the USFS from interfering with Denver's construction activity. After a hearing on August 3, 1979, the district court denied the motion. At the same hearing, Grand County was allowed to intervene as a party defendant as a matter of right under Fed.R.Civ.P. 24(a), and the Mountain States Legal Foundation was allowed to intervene permissively under Fed.R.Civ.P. 24(b). The court also allowed the Sierra Club and the American Wilderness Alliance to intervene permissively.
 
 
 35
 Trial commenced on May 12, 1980, and proceeded for six days. The trial court based its jurisdiction to review the administrative action on 28 U.S.C. Sec. 1331(a) and the judicial review provisions of the Administrative Procedure Act (APA), 5 U.S.C. Secs. 701-706 (1976). Denver also sought to quiet title to its right of way under 28 U.S.C. Secs. 2409a[6] and 1346(f).[7] The trial court ruled that it had no jurisdiction over the quiet title action because Denver failed to state its claim with sufficient particularity, and because the action was barred by the statute of limitation imposed by section 2409a(f). The court also found that it had no subject matter jurisdiction over Denver's claim that the federal government had taken its property rights in violation of the Fifth Amendment. The Grand County intervenors raised counterclaims under state law concerning the applicability of their land use regulations to Denver's Williams Fork Project. The court ruled that it had pendent jurisdiction over those claims.
 
 
 36
 The district court found/ruled that under FLPMA the USFS had the authority to act with respect to Denver's right of way, and that its decisions concerning "alignment" and "canals versus conduits" were not arbitrary, capricious, or otherwise contrary to law. In so ruling, the court had to determine the nature and scope of Denver's right of way grant. It ruled that Denver received exactly what was depicted on the map and survey field notes upon which the grant was based, and that Colorado state law was neither controlling nor necessary in the determination of Denver's rights. Thus, the court found that Denver had deviated from its authorized right of way and that to continue construction off the original grant Denver must apply to the USFS for special use permits or an amended right of way. The court also held that forfeiture of Denver's rights was not proper, that the USFS was not estopped from challenging Denver's activities, and that those activities were subject to NEPA. Finally, the court ruled that Denver was not immune from Grand County's regulations and that, at least on their face, the County's zoning, land use, and administrative regulations were not preempted by federal law, were not contrary to Colorado law, and did apply to Denver's activities on the Williams Fork Project.
 
 ISSUES
 
 37
 Denver raises numerous contentions of error which create the following issues on appeal:
 
 
 38
 (1) Did the USFS have legal authority to issue its stop orders?
 
 
 39
 (2) What is the scope of Denver's right of way grant?
 
 
 40
 (3) Is the USFS estopped from challenging Denver's construction on the Williams Fork Project in the manner and location as presently proposed?
 
 
 41
 (4) Does the Blue River Decree and congressional approval thereof prevent the USFS from interfering with Denver's construction on its right of way?
 
 
 42
 (5) Does NEPA apply to Denver's activities?
 
 
 43
 (6) Did the trial court err regarding its jurisdiction on the quiet title action?
 
 
 44
 (7) Was the application of Grand County's regulations a proper issue for the court to resolve, and if so, did the court err in finding the regulations applicable?
 
 
 45
 The focus of our inquiry, however, is whether the action taken by an agency of the federal government, the USFS, was proper. The resolution of this issue will control the resolution of most of the above issues.
 
 SCOPE OF REVIEW
 
 46
 The parties agree that the administrative action which is the subject of review here is informal agency action, not formal rulemaking or action taken after an adjudicatory hearing. See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The scope of judicial review is therefore governed by section 706 of the APA, which provides in relevant part:
 
 
 47
 The reviewing court shall--
 
 
 48
 * * *
 
 
 49
 * * *(2) hold unlawful and set aside agency action, findings, and conclusions found to be--
 
 
 50
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
 
 
 51
 * * *
 
 
 52
 * * *
 
 
 53
 (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
 
 
 54
 (D) without observance of procedure required by law; ....
 
 
 55
 5 U.S.C. Secs. 706(2)(A), (C) and (D) (1976). In view of those standards, the purpose of judicial review of informal agency action is to examine: "(1) authority of the agency, (2) compliance by the agency with prescribed procedures, and (3) any claim that agency action is arbitrary, capricious, or an abuse of discretion." CF & I Steel Corporation v. Economic Development Administration, 624 F.2d 136, 139 (10th Cir.1980) (citing Overton Park, supra ). The first issue to be resolved is the authority of the USFS to act.
 
 AUTHORITY
 
 56
 The trial court found two bases for the authority of the USFS to issue its stop work orders: (1) Section 501(a) of FLPMA, 43 U.S.C. Sec. 1761(a); and (2) the broad authority delegated by Congress to the USFS, as an agency of the Department of Agriculture, to protect the national forests from unauthorized use. The first prong, Section 501(a) of FLPMA, deals directly with rights of way, providing that:
 
 
 57
 the Secretary of Agriculture, with respect to lands within the National Forest System ..., [is] authorized to grant, issue, or renew rights-of-way over, upon, under, or through such lands for--
 
 
 58
 (1) reservoirs, canals, ditches, flumes, laterals, pipes, pipelines, tunnels, and other facilities and systems for the impoundment, storage, transportation, or distribution of water; ....
 
 
 59
 43 U.S.C. Sec. 1761(a) (1976). The district court found that the authority to issue and manage rights of way across the national forests had been transferred from the Secretary of the Interior to the Secretary of Agriculture. The court also held that "amending" an existing right of way is equivalent to "renewing" one, and therefore is within the contemplation of "granting, issuing, or renewing" rights of way. We disagree.
 
 
 60
 Section 4 of the 1905 act expressly states that rights of way were granted "under such rules and regulations as may be prescribed by the Secretary of the Interior...." 33 Stat. 628, 16 U.S.C. Sec. 524 (1976). It was the Secretary of Interior, not the Secretary of Agriculture, who was vested with the authority to grant and administer rights of way across the national forest lands.
 
 
 61
 In 1976, FLPMA transferred the authority "to grant, issue, and renew" rights of way over national forest to the Secretary of Agriculture. Implicitly, the Secretary was also granted the concomitant authority to administer rights of way granted pursuant to section 1761(a) of FLPMA. Moreover, "insofar as [it] appl[ies] to the issuance of rights-of-way", the act of 1905 was repealed by FLPMA. FLPMA, supra, Sec. 706(a), 90 Stat. 2793 (emphasis added). FLPMA, however, did not expressly confer upon the Secretary of Agriculture the authority to administer preexisting rights of way over national forest lands, nor did it expressly repeal the 1905 act with respect to the administration of preexisting rights of way.
 
 
 62
 Repeals of statutes are to be strictly construed, and repeals by implication are disfavored. Morton v. Mancari, 417 U.S. 535, 550, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974); Watts v. Hadden, 651 F.2d 1354, 1383 (10th Cir.1981). These maxims are particularly appropriate where, as here, the repealing language was limited and Congress further provided that "[n]othing in this Act shall be deemed to repeal any existing law by implication." FLPMA, supra, Sec. 701(f), 90 Stat. 2786. The intent of Congress to repeal the act of 1905 entirely was not "clear and manifest". See Watt v. Alaska, 451 U.S. 259, 267, 101 S.Ct. 1673, 1678, 68 L.Ed.2d 80 (1981); United States v. Borden Co., 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181 (1939); Hadden, supra. Instead, Congress was very careful to repeal that act only "insofar" as it related to the "issuance" of rights of way. We therefore must attempt to read the Act of 1905 and FLPMA so as to "give effect to each if we can do so while preserving their sense and purpose." Watt v. Alaska, supra, 451 U.S. at 267, 101 S.Ct. at 1678 (citing Mancari, supra ).
 
 
 63
 In view of the rules just noted, and Congress's expressed intention not to repeal any acts by implication, we hold that FLPMA did not repeal the act of 1905 with respect to the administration of preexisting rights of way across national forest lands. In fact, the USFS so recognized when it requested that the BLM take steps to terminate Denver's right of way for failure to put it to beneficial use. The Secretary of Agriculture does have the exclusive authority to administer rights of way granted, issued, or renewed pursuant to FLPMA, and no rights of way may be granted under the 1905 act. As to rights of way granted under the act of 1905 and extant at the time FLPMA was passed, however, we hold that the Secretary of the Interior retains the exclusive authority to administer such rights of way. The Ninth Circuit reached a similar result with respect to the general right of way act of 1891 in Grindstone Butte Project v. Kleppe, 638 F.2d 100, 101 n. 2 (9th Cir.) cert. denied, 454 U.S. 965, 102 S.Ct. 505, 70 L.Ed.2d 380 (1981). The trial court was incorrect in relying on 43 U.S.C. Sec. 1761(a) as a source of the USFS's authority to order Denver to halt construction. FLPMA did not give the USFS any authority over Denver's right of way. Only the Interior has continuing authority over Denver's activities concerning the right of way.
 
 
 64
 The second source of authority upon which the trial court relied is the power of the USFS, as an agency of the Department of Agriculture, to prevent the unauthorized use of federal lands. The trial court found that Congress delegated this power to the Department of Agriculture in the following statute:
 
 
 65
 The Secretary of Agriculture shall make provisions for the protection against destruction by fire and depredations upon the public forests and national forests...; and he may make such rules and regulations and establish such service as will insure the objects of such reservations, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction; ....
 
 
 66
 16 U.S.C. Sec. 551 (1976).[8] We agree that this statute confers upon the forest service the duty to protect the forests from injury and trespass, and the power to condition their use and prohibit unauthorized uses. See Sabin v. Butz, 515 F.2d 1061, 1066 (10th Cir.1975); United States v. Hymans, 463 F.2d 615, 617 (10th Cir.1972).
 
 
 67
 Under the authority of section 551, the USFS promulgated the following regulations which were in effect at the time the USFS issued the stop orders:
 
 The following are prohibited:
 
 68
 (a) Cutting or otherwise damaging any timber, tree or other forest product, except as authorized by permit, timber sale contract, Federal law or regulation.
 
 
 69
 * * *
 
 
 70
 * * *
 
 
 71
 (a) Constructing, placing, or maintaining any kind of road, trail structure ... or other improvement without a permit.
 
 
 72
 36 C.F.R. Secs. 261.6(a) and 261.10(a) (1981). We agree with the trial court that the statute and the regulations do authorize the USFS to issue stop orders when unauthorized construction occurs on national forest lands.
 
 
 73
 Whether the stop orders in the instant case were proper involves an inquiry into whether Denver's construction indeed was unauthorized, or whether it was authorized by the original 1924 right of way grant. Thus, as the trial court noted, the primary question in this case is the nature and scope of the interest that Denver received with its 1924 grant under the 1905 act.
 
 
 74
 At this point our inquiry in accordance with Overton Park involves a mixed question. We have not yet determined whether the USFS had authority to issue the stop orders; however, that decision necessarily involves a determination of the scope of Denver's right of way. The USFS did decide that Denver had exceeded the scope of its grant. We must treat that decision with deference, but we have determined that the USFS had authority to act only if Denver indeed was constructing beyond the authorized scope of its right of way. We must evaluate the USFS's decision under the narrow arbitrary and capricious standard of section 706(2)(A) of the APA, and our primary concern will be whether the USFS considered relevant factors so that its decision was not a clear error of judgment. Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974) (citing Overton Park, supra ); CF & I Steel, supra.
 
 
 75
 Nevertheless, because a determination that the decision was proper will also be a determination that the USFS had authority to act, our inquiry into the facts concerning the scope of Denver's right of way indeed must be a "searching and careful" one, a "substantial inquiry". Overton Park, supra, 401 U.S. at 415-16, 91 S.Ct. at 823. We can not substitute our judgment for that of the USFS, id. at 416, 91 S.Ct. at 823; CF & I Steel, supra; Sabin v. Butz, supra, but neither can we permit its assertion of authority to pass unscrutinized. In this situation, we deem it proper to examine not only whether there was some rational basis for the USFS's action, but also whether the action was consistent with intent of Congress, as expressed in the controlling statutes. See Natural Resources Defense Council, Inc. v. SEC, 606 F.2d 1031, 1049-50 (D.C.Cir.1979); Weyerhauser Co. v. Costle, 590 F.2d 1011, 1025 (D.C.Cir.1978). This more stringent review will preserve the wide latitude the USFS has to make decisions within its authority, but also will ensure that it does not exceed that authority.
 
 SCOPE OF THE RIGHT OF WAY GRANT
 
 76
 The focus of our review will be the administrative record and the controlling statutes, the 1905 act, supra, and 16 U.S.C. Sec. 551. Moreover, because the determination of the scope of the grant will also decide the authority of the USFS, we will consider the supplemental record developed by the trial court. See Dunlop v. Bachowski, 421 U.S. 560, 574, 95 S.Ct. 1851, 1861, 44 L.Ed.2d 377 (1975). The administrative and trial records disclose the following facts about the scope of Denver's right of way.
 
 
 77
 During the period of initial construction between 1937 and 1940, Denver, apparently unsure of the extent to which the USFS had authority over the right of way, filed an application for a special use permit. In response to that application, the USFS Forest Supervisor for Arapahoe National Forest wrote a letter, dated September 22, 1937, to the Regional Forester in Denver, stating:
 
 
 78
 In comparing the map attached to this application with map filed with the easement (Denver 027915) it is obvious that the right-of-way concerned is the same. The easement is apparently for a right-of-way for "canals and reservoirs" whereas the Special Use Application is for "pipe lines and dams."
 
 
 79
 The easement is still in effect and would not the construction of pipelines in place of canals be authorized under the easement, or will a new special use be necessary?
 
 
 80
 [Joint App., Vol. III, p. 484]. The Assistant Regional Forester responded: "If the easement grant covers the same right-of-way as that now applied for, there would, of course, be no occasion for a special use permit; neither would we have authority to grant such permit on top of an outstanding easement." [Joint App., Vol. III, p. 485].
 
 
 81
 Apparently the USFS and Denver had further discussions which culminated in a memorandum, dated October 13, 1937, issued by an assistant law clerk in the USFS. The memorandum concluded:On October 13, Mr. Gilbert, City Engineer's Office, who has been in charge of the plotting of the project called at this office and verified the identical location of proposed project described in the permit application, and the easement above mentioned.... The case will be officially closed when [the withdrawal] letter is received.
 
 
 82
 [Joint App., Vol. III, p. 487]. On October 15, 1937, Denver submitted a letter withdrawing its application for special use permits with the understanding that "this matter has been fully covered by grant of easement made by the Secretary of Interior on May 5, 1924 under Denver Serial No. 027,915." [R., Vol. XX, U.S. Ex. A-119]. Thus, before Denver ever utilized any conduits, the USFS explicitly determined that "pipelines" were within the scope of Denver's Williams Fork right of way, granted for "canals", and that it had no authority over such a use. At the same time, however, Denver expressly informed the USFS that construction would occur on an alignment identical to that shown on the original map.
 
 
 83
 Meanwhile, on October 9, 1937, Denver submitted its sixth show cause report to the Interior. There Denver stated that "plans and specifications have been prepared for the construction work on collecting ditches to bring water to the west portal of [the] tunnel...." [R., Vol. XIX, Pl. Ex. 5]. Prior to construction, then, Interior was not aware of the use of steel conduits; the USFS, however, was aware, and ruled that such a use was within the scope of the right of way grant.
 
 
 84
 In Denver's seventh show cause report, it expressly informed the Interior that "steel cylinder pipe conduits ... have been completed and are now in operation." [Id.]. Denver also reported that it had altered the original alignment and recognized that such changes in alignment would require an amended application:
 
 
 85
 In the course of actual construction there have been certain slight changes in alignment of canals and in some cases distinct departures from the original plan for the sake of ultimate economy and efficiency in maintenance and operation. Denver is now preparing the necessary maps and other information for an amended application ... so that final grant may be made by the United States of America as to those portions of the project which have been fully completed.
 
 
 86
 [Id.]. The Interior, with the approval of the USFS, accepted the seventh report and suspended further action on cancellation until December 31, 1942.
 
 
 87
 On February 3, 1942, the Interior mistakenly requested an early show cause report from Denver on the Williams Fork Project and the Fraser River Project, which also was being built on a right of way granted under the 1905 act. Denver responded on February 5, 1942, and, addressing both projects, stated:
 
 
 88
 While a great deal of completed construction has been done, a large portion of it requires a resurvey because actual construction did not occur exactly as originally proposed.... We will make every effort to form the necessary parties and do the necessary work, but if, by the middle of the year 1942, we find we will be unable to meet the extended date heretofore allowed, we will make a limited showing based upon information which is available and ask for further extension for the more detailed showing which will ultimately be required.
 
 
 89
 [Joint App., Vol. IV, p. 617]. Thus, Denver again expressly recognized the need to file amended surveys, at least with respect to completed construction.
 
 
 90
 As Denver predicted, however, the shortage of manpower during World War II prevented it from forming survey parties for the 1942 field season. When it filed its eighth show cause report for the Williams Fork Project, it did not file an amended survey. That report, dated December 29, 1942, expressly stated that actual construction consisted of cylindrical steel pipe, but it did not mention the deviations from the original alignment.
 
 
 91
 On December 28, 1942, Denver filed affidavits showing proof of construction on the portion of the Williams Fork Project already completed. Those affidavits followed the "due proof" forms set out in the regulations then extant. One affidavit, signed by Albion Vickery, the city engineer of the City and County of Denver, again revealed that actual construction consisted of cylindrical steel pipe. The affidavit also stated that "the constructed work [from the tunnel to 1500 feet beyond Steelman Creek] conformed to the map which received the approval of the Secretary of the Interior on May 5, 1924...." [Joint App., Vol. IV, p. 619]. The accompanying affidavit was signed by Ben Stapleton, the Mayor of the City and County of Denver, and A.P. Gumlick, the president of the Denver Water Board, and stated that the Williams Fork Construction was "actually constructed ... on the exact location represented on the map approved by the Secretary of the Interior on the 5th day of May, 1924...." [R., Vol. XX, U.S. Ex. 119]. Thus, there can be no doubt that the Interior and the USFS were aware of and approved of the steel conduit construction. Denver, however, did not file the amended maps it had represented it would file; instead, it swore that the construction had occurred on the exact alignment shown on the original survey map upon which the right of way was granted.
 
 
 92
 As was noted earlier, no significant construction took place between 1942 and 1978. The USFS first began to question Denver's right of way in 1976. It was 1978 when the USFS first challenged "canals versus conduits". It was also 1978 when, because of Denver's conflicting reports and affidavits, the USFS first became aware of the alignment deviations.
 
 
 93
 In conjunction with these facts, we must also consider the controlling statutes. Natural Resources Defense Council, Inc., supra. The statute upon which the USFS's action must be based is 16 U.S.C. Sec. 551, supra. The congressional intent, expressed in the plain language of the statute, was that the USFS, as an agency of the Secretary of Agriculture, would be authorized to protect the national forests against fire and depredations, regulate their use, and preserve the forests from destruction. 16 U.S.C. Sec. 551 (1976).
 
 
 94
 We also note that the 1905 act specifically allowed rights of way for "pipelines", as well as "canals". Only in the Interior's regulations governing applications is there a distinction between the use of pipe or conduit and the use of open canals. Even there, the only difference is that an application for a "pipeline" right of way was required to include the diameter of the pipe to be used. 36 Pub.Lands Dec. 572, para. 11 (1908). The facts related above establish that in 1937 the USFS clearly considered "canals" and "conduits" to be equivalent. Further, the evidence shows that conduits require no greater width of right of way. In fact, it was shown that the USFS actually considers them to be environmentally preferable to open canals.
 
 
 95
 It is our view that the 1905 act authorized the use of conduits, and that the USFS originally considered construction with conduits to be an authorized use within a right of way granted for "canals". It seems clear that the use of conduits not only does not increase harm to the national forests, but actually decreases the amount of harm caused by construction of a "canal" right of way. We therefore hold that the decision of the USFS that construction with conduits is outside of the scope of the right of way grant is contrary to the intent of Congress and is arbitrary, capricious, and an abuse of discretion. With respect to the use of steel conduits, Denver has acted within the scope of its right of way grant, and no further authorization is required to continue such use. Consequently, inasmuch as Denver was conducting an authorized use under a valid grant, the USFS had no authority to order Denver to stop construction.
 
 
 96
 With respect to the "alignment" decision, however, we reach a different result. First, the USFS and the Interior had no notice of Denver's decision to construct on a different alignment prior to the time construction occurred. When Denver did inform the Interior of the deviation, it expressly recognized that an amended application would be necessary. Then, one year later, it informed the Interior that it had constructed on the exact alignment shown on the map upon which the right of way was granted. On the Fraser River Project, using a right of way granted under the same 1905 statute, Denver was required to obtain approval of an amended application prior to continuing construction deviating from the original alignment. Finally, in 1975 the Interior promulgated a regulation requiring prior approval before any deviations occurred. These facts establish that Denver's planned construction deviating from the right of way shown on the original map application without prior permission is not authorized by the original grant.
 
 
 97
 Moreover, in addition to its lack of authorization, Denver's construction may cause unknown damage to the national forest. Denver contends that the new alignment is consistent with the "gravity flow concept" and, since it follows almost a parallel alignment, will cause no greater damage than the original alignment. However, the right of way was not granted in recognition of a concept. Denver submitted a map and field notes that it swore accurately represented a proper flow line. Based on the map and field notes, which were required to "be so complete that from [them] the surveys could be accurately retraced by a competent surveyor with proper instruments," 36 Pub.Lands Dec. 572, para. 10 (1908), Denver was granted a right of way for a specific area. It was rational for the Interior to require accuracy so that it and the USFS could plan properly. If problems were encountered in actual construction, the Interior provided a procedure for amending the application. Even now, Denver has not submitted complete revised plans to the Interior. Accordingly, the Interior, and, more importantly, the USFS are unable to carry out their planning and management functions.
 
 
 98
 We hold that by virtue of constructing on the new alignment, without having obtained prior approval from the Interior, Denver exceeded the authorized scope of its grant. Inasmuch as its activities were not authorized by the grant, the USFS did have authority to halt Denver's unauthorized construction. This action of the USFS was not arbitrary or capricious. It was consistent with the intent of Congress in that it protected the national forest land from destruction and unauthorized use.[9] The stop order based on deviations from the original alignment is valid.[10]
 
 
 99
 The conditions imposed by the stop order, however, are also subject to judicial review. Diamond Ring Ranch, Inc. v. Morton, 531 F.2d 1397, 1406-1407 (10th Cir.1976). We must emphasize that the authority upon which the stop order is based derives from 16 U.S.C. Sec. 551, supra. That authority is limited to the protection of the national forests; it does not include the power to administer rights of way. Unless Denver applies for a new right of way, that power resides solely in the Interior, as we have held. We have determined that Denver has deviated from its right of way. We now hold that the deviation is a problem of administration, within the sole jurisdiction of the Interior. Denver need not request the grant of a new right of way or a renewal of the old one from the USFS; its original right of way has never been relinquished. It is still valid, and, but for the fact that it would be technologically difficult and economically infeasible, could still be utilized by Denver.[11] Instead, Denver can resolve the deviation problem through the agency with administrative authority over the right of way, the Interior.
 
 
 100
 The problem presented by this result is that the regulations which would have governed the problem have been superseded by regulations promulgated under FLPMA. We have held, however, that FLPMA can have no effect on this right of way. Nevertheless, at the time the stop orders were issued the regulations were still in force. Moreover, the statute under which the regulations were issued is still in force, at least with respect to administration of rights of way.
 
 
 101
 In Greene v. United States, 376 U.S. 149, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964), the appellant asserted a claim pursuant to one regulation, but while his claim was being processed, the regulation was changed. The Government argued that the new regulation governed the appellant's rights. The Supreme Court rejected that argument and held that because the appellant's rights matured and were asserted under the older regulation, it would be "unjustifiable to give the later regulation retroactive effect." Id. at 160, 84 S.Ct. at 621. The Court thus applied the older, superseded regulation even though the later regulation was issued under the same statute as the earlier. Furthermore, the Supreme Court has held that revocation of a regulation does not bar prosecution for a violation of its provisions which occurred at a time when it remained in force, provided that the statute upon which the regulation was based has not been repealed. United States v. Hark, 320 U.S. 531, 536, 64 S.Ct. 359, 361, 88 L.Ed. 290 (1944); see also, United States v. Resnick, 455 F.2d 1127, 1134 (5th Cir.1972).
 
 
 102
 We believe, therefore, that it would be equitable and proper to require Denver to comply with the regulations under the 1905 act which were in effect at the time the stop orders were issued. As noted earlier, the controlling regulation provides:
 
 
 103
 No deviation from the location of an approved right-of-way shall be undertaken without the prior written approval of the authorized officer.[12] The authorized officer may require the filing of an amended application ... wherein the authorized officer's judgment the deviation is substantial.
 
 
 104
 43 C.F.R. 2802.2-4 (1979) (emphasis added). Accordingly, we hold that Denver must seek permission to continue construction on the present alignment from the appropriate BLM office. Only the BLM can decide whether Denver's deviation is substantial, and whether Denver must amend its application; we can not so decide. We emphasize again that if an amendment is found to be necessary, such an amendment will be a matter of administration, i.e., a correction of the original right of way which will relate back to that grant. It will not be a grant, issuance, or renewal; thus FLPMA will not apply.[13]
 
 NEPA
 
 105
 Denver argues that it is acting within the scope of its right of way grant, so there is no need for any further federal approval of its activities. As a result, there is no proposed federal action capable of invoking NEPA. See Kleppe v. Sierra Club, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). In view of our ruling that Denver has exceeded the scope of its right of way and must obtain the BLM's permission to continue construction, Denver's argument is inapposite. Further federal approval, that of the BLM, is necessary before Denver can continue construction off the original grant; accordingly, we must consider the application of NEPA.
 
 
 106
 NEPA requires federal agencies to comply with its requirements "to the fullest extent possible". 42 U.S.C. Sec. 4332 (1976). To that end, they are required to file an environmental impact statement (EIS), considering environmental impacts and alternatives to the proposed action, with all "proposals for ... major Federal actions significantly affecting the quality of the human environment...." 42 U.S.C. Sec. 4332(C) (1976). When there is continuing federal involvement in an ongoing project which preexisted NEPA, NEPA may still apply. Hart v. Denver Urban Renewal Authority, 551 F.2d 1178 (10th Cir.1977). Its application depends upon a balancing of several factors, including the degree to which the project has been completed and the burden of compliance. Id.
 
 
 107
 We decide only that the requirements of NEPA do apply to the BLM's consideration of Denver's deviation. The extent of its application must be decided in the first instance by the BLM. Jette v. Bergland, 579 F.2d 59, 62 (10th Cir.1978). That agency must decide whether the project has reached a point at which the cost of compliance with NEPA outweighs the benefits. Hart, supra. Even if it is decided that the balance favors compliance, the BLM yet must determine whether compliance requires an EIS. Strycker's Bay Neighborhood Council, Inc. v. Karlen, 444 U.S. 223, 228, 100 S.Ct. 497, 500, 62 L.Ed.2d 433 (1980); Jette, supra, at 62; Wyoming Outdoor Coordinating Council v. Butz, 484 F.2d 1244, 1250 (10th Cir.1973).
 
 ESTOPPEL
 
 108
 Denver also contends that the USFS is estopped from objecting to continued construction off the original grant because it, the BLM, and the PWA acquiesced in and consented to the original construction off the right of way between 1937 and 1940. The actions of the PWA can not be a basis for estoppel. The PWA simply approved Denver's requests for funds and the manner in which they were disbursed; it had no authority to do more. In particular, it had no power with respect to the disposition of national forest lands. The Supreme Court has made clear that federal "officers who have no authority at all to dispose of Government property cannot by their conduct cause the Government to lose its valuable rights by their acquiescence, laches, or failure to act." United States v. California, 332 U.S. 19, 40, 67 S.Ct. 1658, 1669, 91 L.Ed. 1889 (1947) (footnote omitted); see also Utah Power and Light Co. v. United States, 243 U.S. 389, 409, 37 S.Ct. 387, 391, 61 L.Ed. 791 (1917). Estoppel, if applicable at all, can lie only against an agency to which Congress has delegated the authority to dispose of lands held in trust for the public; the PWA had no such authority.
 
 
 109
 Congress did delegate to the Interior the authority to grant and administer rights of way in the act of 1905. Moreover, the Interior routinely notified the USFS of its actions concerning Denver's right of way and obtained that agency's approval. Without determining the extent to which equitable estoppel will apply to these agencies of the United States Government, however, we hold that Denver has failed to make out a traditional case of estoppel.
 
 The traditional elements of estoppel are:
 
 110
 "(1) The party to be estopped must know the facts; (2) He must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) The latter must be ignorant of the true facts; and (4) He must rely on the former's conduct to his injury."
 
 
 111
 Sweeten v. United States Department of Agriculture Forest Service, 684 F.2d 679, 682, n. 5 (10th Cir.1982) (quoting United States v. Ruby Co., 588 F.2d 697, 703 (9th Cir.1978), cert. denied, 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979)). With respect to the original construction in 1937-40, Denver informed the USFS it would construct on the exact location shown on the original map. After the initial construction, Denver first reported a deviation, then later swore that construction occurred on the exact location shown on the original map. The trial court found, and we agree, that neither the USFS nor the Interior was aware of Denver's deviation until 1978. Accordingly, the first element of estoppel is not satisfied.
 
 
 112
 Moreover, Denver was not ignorant of the true facts. In its seventh show cause report it recognized the need to file an amended application. Further, the Interior's treatment of the Fraser River Project and its promulgation of the deviation regulation expressly informed Denver of the need to obtain prior approval of deviations. Thus, Denver has also failed to establish the third element of estoppel. Since Denver's estoppel theory would be unavailing against even a private party, it manifestly must fail against the USFS and the Interior. Utah Power and Light, supra; Sweeten, supra.
 
 BLUE RIVER DECREE
 
 113
 Denver also contends that congressional approval of the Blue River Decree prevents the USFS from challenging Denver's right of way. Denver's argument is that the decree, as approved by Congress, confirmed Denver's priority in the waters of the Williams Fork, and quieted its title to the right to "divert and utilize" those waters. Denver maintains that the only way it can "divert and utilize" the waters is to continue construction along the modified right of way alignment; thus, the court implicitly recognized Denver's right of way, and Congress approved it. Now, Denver contends, the USFS has defied Congress by interfering with its right to "divert and utilize" water.
 
 
 114
 The stipulations incorporated into the Blue River Decree set forth various water rights and their priorities. The relevant rights are those which Denver has for its Williams Fork Diversion Unit, with a priority date of July 4, 1921. Those rights were confirmed in a 1937 decree, In the Matter of Priorities of Water Rights in Water District No. 1, No. 657, (District Court of Grand County, Colo., November 5, 1937). In that decree, the court specifically ruled that:
 
 
 115
 No part of this decree shall in any case be taken, deemed or held to confirm, impair, or in any manner affect any claim of right or property claimed or held by any person, association or corporation, in or to any ditch, pipe line, canal, reservoir or other structure, ... or to the land held or claimed as right of way for any of them....
 
 
 116
 Id. at 2-3 (emphasis added). That proviso is in accordance with settled Colorado law that "[a] water decree is a determination of a specific issue presented to the court.... The statement of claim presents the issue. The decree is limited by the issue it resolves." Orchard City Irrigation District v. Whitten, 146 Colo. 127, 361 P.2d 130, 134 (1961). The only issue before the court was the priority of water rights. In fact, in Colorado a conditional water right may be obtained without first obtaining a right of way for the means of conveying the water. Bubb v. Christensen, 610 P.2d 1343, 1347 (Colo.1980). It is clear that the right stated in the stipulation and confirmed in the Blue River Decree in no way confirmed Denver's right of way.
 
 
 117
 Nor did the Blue River Decree itself address Denver's right of way. The only issue before the court was the right of various parties to appropriate waters. The situation is the converse of that in Utah Power and Light, where the Supreme Court refused to confuse the issues before it by stating: "this is not a controversy over water-rights but over rights of way through lands of the United States, which is a different matter...."[14] Utah Power and Light, supra, 243 U.S. at 411, 37 S.Ct. at 392. The issue of Denver's right of way was not before the court, nor did the decree confirm the right of way. By confirming Denver's right to "divert and utilize" the waters of the Williams Fork, the decree simply recognized Denver's right to appropriate those waters. It has long been settled that:
 
 
 118
 The right to appropriate the waters of a stream does not carry with it the right to burden the lands of another with a ditch for the purpose of diverting the waters and carrying them to the place of intended use, for that cannot be done without a grant from the landowner...; and this although the particular circumstances be such that the proposed appropriation cannot be effected without the ditch.
 
 
 119
 Snyder v. Colorado Gold Dredging Co., 181 F. 62, 69 (8th Cir.1910). Thus, the Blue River Decree, and congressional approval thereof, in no way prevents the USFS from challenging Denver's use of its right of way. The decree only prohibits the USFS from challenging Denver's water rights; no such challenge is before us.
 
 QUIET TITLE
 
 120
 We have held that Denver must obtain permission to continue construction off the original alignment. Accordingly, we need not determine whether Denver's quiet title action was properly dismissed.
 
 GRAND COUNTY REGULATIONS
 
 121
 The trial court held that, on their face, Grand County's Comprehensive Plan, Zoning Regulations, and Administrative Regulations were not preempted by federal law, and did apply to Denver's Williams Fork Project as a matter of state law.[15] The keystone of the trial court's decision, and of Grand County's arguments, is that Denver must obtain a new right of way permit from the USFS under the requirements of FLPMA. Section 505 of FLPMA requires that:
 
 
 122
 Each right-of-way shall contain--(a) terms and conditions which will ... (iv) require compliance with State standards for public health and safety, environmental protection, and siting, construction, operation, and maintenance of or for rights of way for similar purposes if those standards are more stringent than applicable Federal standards; ....
 
 
 123
 43 U.S.C. Sec. 1765(a) (1976). We have held, however, that FLPMA has no application to Denver's right of way. Denver need not apply for a new right of way from the USFS; it already has a valid right of way. Thus, FLPMA can not support the application of Grand County's regulations.
 
 
 124
 The court's subsidiary bases for applying the regulations were NEPA[16] and the Multiple Use and Sustained Yield Act of 1960.[17] Besides being more permissive and aspirational than mandatory, they do not apply here. Inasmuch as we have held that the USFS has no authority over Denver's right of way, the Multiple Use and Sustained Yield Act, and agreements entered under it, have no application. With respect to NEPA, we held that the BLM must determine the extent to which that act applies. We do not say that the BLM cannot consult with Grand County in its consideration of Denver's deviation. We simply observe that it is premature to determine the extent to which NEPA should apply. In any event, NEPA cannot support the application of Grand County's regulations.
 
 
 125
 As a matter of federal law, the only remaining basis for the application of Grand County's regulations is the language in the 1905 act itself, i.e., that the rights of way are granted under the regulations of the Interior, and "subject to the laws of the State" in which the national forest is situated. 16 U.S.C. Sec. 524 (1976). We have found no decisions which interpret that language. In Columbia Basin Land Protection Association v. Schlesinger, 643 F.2d 585 (9th Cir.1981), however, the court interpreted similar language.
 
 
 126
 In Columbia Basin, the BLM issued a permit to the Bonneville Power Administration (BPA) for a power line right of way. The permit was issued under FLPMA and subject to 43 U.S.C. Sec. 1765, the section of FLPMA which Grand County sought to invoke here. As set out above, that section mandates that the right of way contain conditions requiring compliance with "State standards" concerning rights of way, if the standards are more stringent than the federal ones. 43 U.S.C. Sec. 1765, supra. Citing that section, Franklin County sought to require the BPA to comply with its comprehensive land use plan. In particular, the county noted that Washington state law required the county to develop such a plan. The Ninth Circuit refused to read "State standards" as including local requirements: "If Congress had meant to include local plans such as that of Franklin County, they could have easily worded the statute to reflect that intent. We therefore hold that the BPA is not required to comply with the terms of the Franklin County Comprehensive Plan." Columbia Basin, supra at 606.
 
 
 127
 The language of FLPMA is more specific than that of the 1905 act. Further, Congress undoubtedly was more sensitive to the need for environmental planning at the time of the passage of FLPMA than at the time of the 1905 act. Thus, we hold that the 1905 act simply requires compliance with state law, not local regulations. As a matter of federal law, there is no basis for the application of Grand County's regulations to Denver's Williams Fork Project. We need not, and do not, decide whether those regulations may apply as a matter of Colorado law. Nor do we hold that the BLM is prohibited from considering the application of those regulations as a matter of administration of Denver's right of way. We hold only that Grand County has advanced no theory upon which we can find federal authority for the application of Grand County's regulations here.
 
 CONCLUSION
 
 128
 The USFS's stop order is valid insofar as Denver is constructing off the exact location of the 1924 right of way. However, Denver need not comply with the conditions of the stop order. Instead, it must comply with the procedures set out in 43 C.F.R. 2802.2-4 (1979), supra. That is, it must request permission from the BLM to continue construction off the exact location shown on the 1924 map. The BLM must determine whether Denver's deviations are so substantial as to require an amended application. In any event, Denver's 1924 right of way will remain the source of its authority, whether as originally shown or as amended; Denver need not apply for a new right of way under FLPMA. The BLM must determine the extent to which NEPA applies and the extent to which Grand County's regulations should be considered. The judgment of the district court is therefore affirmed in part and reversed in part.
 
 
 
 [1]
 The regulations were amended in 1916 to allow applications for rights of way across unsurveyed lands. 45 Pub.Lands Dec. 91 (1917). The lands here in question were unsurveyed at the time of Denver's application
 
 
 [2]
 The regulation was added to Subpart 2800, which was actually promulgated under the General Right of Way Act of 1891. That Subpart, however, expressly applied to rights of way granted under the 1905 act, and the 1905 regulations expressly incorporated it
 
 
 [3]
 On March 28, 1978, the USFS filed its Draft Environmental Impact Statement for the Roadless Area Review and Evaluation, RARE II, which classified the Williams Fork Area as a "further study" area. On June 28, 1978, USFS filed its Williams Fork Land Management Plan and Final Environmental Impact Statement for that plan. In the final EIS, the USFS recognized that the "existing right of way (easement) [held by Denver] is a legal encumbrance on the land."
 
 
 [4]
 It should be noted that as recently as January 27, 1976, the USFS had recommended that the BLM accept Denver's thirty-seventh show cause report, dated December 9, 1975. As was described above, those reports were required and filed to establish that Denver was attempting to put the right of way to beneficial use. Approval of the reports signified that the Interior and the USFS agreed that Denver had not abandoned the right of way
 
 
 [5]
 One of the primary concerns of the USFS in this suit is that Denver has never submitted complete and final plans showing to what extent the modified project will deviate from the right of way shown on the original map
 
 
 [6]
 "(a) The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest...." 28 U.S.C. Sec. 2409a(a) (1976)
 
 
 [7]
 "(f) The district courts shall have exclusive original jurisdiction of civil actions under Section 2409a...." 28 U.S.C. Sec. 1346(f) (1976)
 
 
 [8]
 FLPMA also repealed this statute to the extent that it is applicable to the issuance of rights of way. FLPMA, supra, Sec. 706(a)
 
 
 [9]
 Denver also challenged the action of the USFS as being the result of significant bias against Denver. We simply note that the evidence does not support this contention
 
 
 [10]
 The trial court also found that the USFS followed proper procedures in taking its action. This finding was not challenged, and we have seen no evidence which indicates it should have been. Under section 706(2)(D) of the APA, supra, and Overton Park, supra, the informal action of the USFS was taken in accordance with the procedures required by law
 
 
 [11]
 Through 1977 the Interior and the USFS accepted show cause reports from Denver. Those acceptances recognized that Denver was trying to put the right of way to beneficial use, so no action should be taken to seek cancellation of the right of way. In 1977, the BLM specifically ruled that Denver was complying with the beneficial use requirement of the 1905 act, supra. Nor has the Interior ever initiated any forfeiture proceedings in a court of law
 
 
 [12]
 "Authorized officer" is defined as: "an officer of the proper office [of the BLM] for the district in which the lands applied for are situated...." 43 C.F.R. 2800.0-5(d) (1979)
 
 
 [13]
 We also note that the BLM's decision is not limited to Denver's project as presently proposed. The BLM can give the same consideration to the alternative projects Denver proposed at the request of the USFS, or any other proposal Denver desires to set forth. The determination will be the same: does the proposed project substantially comply with the original grant?
 
 
 [14]
 This language should answer Denver's concern that the district court may have jeopardized its water rights by questioning its due diligence. The trial court was not addressing due diligence in the water right sense, nor could it do so; the issue simply was not before it. The district court's dictum can have no effect on Denver's water rights
 
 
 [15]
 The trial court summarized these regulations at 517 F.Supp. 170-72, n. 11-15
 
 
 [16]
 In its congressional declaration of policy, NEPA provides that "it is the continuing policy of the Federal Government, in cooperation with State and local governments, ... to use all practicable means and measures ... to create and maintain conditions under which man and nature can exist in productive harmony...." 42 U.S.C. Sec. 4331(a) (1976). The regulations translate this policy into more specific requirements of cooperation with state and local governments in the NEPA planning process. See 40 C.F.R. Secs. 1501.2(d)(2), 1501.5(b), (d), and 1501.7(a)(1) (1981)
 
 
 [17]
 That act provides that "the Secretary of Agriculture is authorized to cooperate with interested State and local governmental agencies and others in the development and management of the national forests." 16 U.S.C. Sec. 530 (1976). Also, 16 U.S.C. Sec. 551a authorizes the Secretary of Agriculture to cooperate with state and local governments in the enforcement of state and local laws on lands within the national forests. The USFS and the Grand County Commissioners entered into an "Agreement for Land Use Planning Coordination" on December 14, 1973, providing for cooperative planning between the two entities. The USFS relied on this agreement in requiring Denver to comply with the Grand County regulations