**WESRECO, INC., dba Western Refining Company, Industrial Energy Partners, Ltd., MM & S Partners, and Anna W. Drake, Trustee in Bankruptcy for Western Oil Marketing Company, Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF the INTERIOR, and William Clark, Secretary of the Interior, Defendants.**

**No. C 84–0126J.**

United States District Court,
D. Utah, C.D.

April 12, 1985.

Leslie K. Dillon, Geoffrey R. Heath & Stephen Hart, Dept. of Justice, Washington, D.C., Peter Stirba, Asst. U.S. Atty., Salt Lake City, Utah, for defendants.

## MEMORANDUM OPINION and ORDER

JENKINS, Chief Judge.

Plaintiffs filed their complaint in this action on February 17, 1984, seeking primarily money damages based on the United States' sale to them of royalty crude oil between June, 1976 and January, 1981. The sales are alleged to have been in violation of mandatory price regulations established pursuant to the Emergency Petroleum Allocation Act of 1973 (EPAA), 15 U.S.C. § 751 et seq. Defendants move for Summary Judgment or the ground that plaintiffs cannot recover damages from the United States because Congress has not waived sovereign immunity from the asserted claims. Alternatively, defendants move for partial summary judgment on the ground that state statutes of limitation are applicable and, thus, bar some of plaintiffs' claims for damages.

Following briefing and oral argument on the motion, the court took the matter under advisement.[1] After careful consideration of the pleadings, memoranda, argument and supplemental case law submitted on behalf of the parties, the court issues the following Memorandum Opinion and finds that 1) Congress has waived sovereign immunity for claims against the government of the type before this court, 2) plaintiffs have stated a claim upon which relief can be granted, 3) this court has proper subject matter jurisdiction to entertain this suit, and 4) the applicable statute of limitations provision is 28 U.S.C. § 2401(a).

## I. FACTUAL BACKGROUND

Plaintiffs in this action include Wesreco, Inc., dba Western Refining Co., Industrial Energy Partners, Ltd., MM & S Partners and Anna Drake, Trustee in bankruptcy for

Brent V. Manning, Salt Lake City, Utah, Wm. H. Bode & John E. Varnum, Washington, D.C., Spriggs, Bode & Hollingsworth, Anna M. Drake, Salt Lake City, Utah, for plaintiffs.

1. Defendants also moved for a Protective Order, requesting a stay of further discovery pending a ruling on the Motion for Summary Judgment. The court granted defendants' Motion for a Protective Order.

Western Oil Marketing Company (Western).[2] Defendants are the United States Department of the Interior (DOI) and William Clark, Secretary of the DOI.

Western purchased some six million barrels of federal royalty crude oil[3] from the United States Geological Survey (USGS), a sub-agency of the DOI, between June, 1976 and January 1981. During that period, the Emergency Petroleum Allocation Act of 1973 (EPAA), 15 U.S.C. § 751 et seq. was in effect. The EPAA empowered the President to fix the price of all sales of domestic crude oil. 15 U.S.C. § 753(a). Pursuant to the EPAA, the Department of Energy (DOE)[4] promulgated regulations that established a "two-tier" price structure for the sale of domestic crude. 10 C.F.R. Part 212, Subpart D. Under the two-tier price structure, "new crude" could be sold at the free-market or "upper-tier" price, but "old crude" was limited to a maximum "lower-tier" price. 39 Federal Register 1924 (Jan. 15, 1974); 41 Federal Register 4931 (Feb. 3, 1976.) The regulations also required each oil "producer" to certify to its purchasers the amount and kind of oil it was selling in each price category. The certification was required to be in writing and furnished to the buyer within two months of the month of production and sale. If certifications were not timely or in proper form, regulations required the oil to be deemed "old oil" which, of course, could only be sold at the lower-tier price. 10 C.F.R. § 212.131(a)(6).

Plaintiffs contend that the DOI was expressly subject to the price regulations when it sold royalty crude oil to Western. Western alleges that the DOI consciously and deliberately violated the price regulations when it refused to properly and timely certify the royalty crude it sold to Western, but, nonetheless, charged Western the upper-tier, market level price for the oil instead of the lower-tier, limited price which it should have charged in accordance with the regulations. Western also asserts that the DOI improperly calculated some of the charges and collected administration fees that were in violation of the EPAA regulations. Western seeks, among other things,[5] recovery of the alleged overcharges and unlawful administrative fees. The amounts in controversy for actual damages exceed $32,000,000.[6]

Western invokes the jurisdiction of this court under sections 210 and 211 of the Economic Stabilization Act of 1970 (ESA),

2. Prior to January, 1981, Industrial Energy Partners, Ltd., Minnesota Gas Company and Western Oil Marketing Company acquired, as tenants in common, a refinery located in Utah. Pursuant to an agreement between Wesreco, Inc., dba Western Refining Company, and the owners of the refinery, Wesreco operated the refinery. On September 1, 1982, MM & S Partners acquired the interest of Minnesota Gas Company, which had merged with Minnegasco, Inc. on July 27, 1982. Anna W. Drake is the trustee in bankruptcy for Western Oil Marketing Company, which filed for bankruptcy in January, 1982. Pursuant to an order of the Second Judicial District Court of Davis County, State of Utah, dated March 7, 1983, Industrial Energy Partners, Ltd. and MM & S Partners acquired from the receiver of Wesreco, Inc. all tangible and intangible assets of the receivership of Wesreco, Inc. (Complaint at ¶ 4.)

3. Under the Mineral Lands Leasing Act of 1920, 30 U.S.C. § 181 et seq., and the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 et seq., the Secretary of the Interior is authorized to grant oil and gas leases on federally owned or controlled lands. The Secretary may take royalties accruing under the oil and gas leases "in kind".

The Secretary may sell "in kind" royalties, such as royalty crude oil, to defined classes of small independent refiners. Western is a small, independent refiner who purchased royalty crude oil from the Secretary of the Interior.

4. Authority to regulate petroleum prices was transferred from the Federal Energy Administration (FEA) to the DOE with the passage of the Department of Energy Organization Act, 42 U.S.C. § 7101, 7151(a) (1977).

5. Western additionally requests Declaratory Judgment that the overcharges were intentional and requests an Injunctive Order requiring the DOI to deliver to Western an amount of royalty crude oil that is equal to the fair market value of its damage claims. Complaint, ¶¶ 39, 41.

6. Western alleges that it was illegally charged $335,534.24 for administrative fees, $107,030.27 for overcharges resulting from miscalculation or misapplication of formulae and $31,999,-248.37 for overcharges resulting from improper certification. Western also seeks treble damages, attorney's fees and costs pursuant to § 210(b). Complaint, ¶¶ 32, 33, 34, 43, 47.

12 U.S.C. § 1904, which is incorporated in § 5(A)(1) of the EPAA, 15 U.S.C. § 754(a)(1) (hereafter referred to as § 210 and § 211.) Section 210(a) is the private right of action provision that grants "[a]ny person suffering legal wrong because of any act or practice arising out of [the EPAA]" a right to bring a cause of action in the United States District Courts for damages, declaratory judgment or injunctive relief. Section 210(b) expressly contemplates claims for "overcharges". Section 211 vests the United States Districts Courts with exclusive jurisdiction, without regard to amount in controversy, of any action arising under the EPAA.

For purposes of this Motion, there are no material factual disputes and this court can decide the issues raised as a matter of law.

## II. DISCUSSION

■ This court notes initially that this is an action against the United States. Although plaintiffs' have named the DOI and Secretary Clark in his official capacity, whether a particular action is one against the United States "is determined not by the party named as the defendant, but by the issues presented and the effect of the judgment." *State of New Mexico v. Donald T. Regan*, 745 F.2d 1318, 1320 (10th Cir.1984); *Transwestern Pipeline Company v. Kerr-McGee Corporation*, 492 F.2d 878, 884

(10th Cir.1974), *cert. denied*, 419 U.S. 1097, 95 S.Ct. 691, 42 L.Ed.2d 689 (1975). Here, the DOI and the Secretary were clearly acting in an official capacity when they undertook to sell royalty crude oil to Western. The manner in which the crude oil sales were accomplished may have been in violation of certain regulations, but it is not alleged that defendants were acting beyond the scope of their delegated powers in undertaking to sell the crude. For that reason and because the types of relief sought here would necessarily operate against the United States, the present action must be deemed as one against the sovereign. *See Hawaii v. Gordon*, 373 U.S. 57, 58, 83 S.Ct. 1052, 10 L.Ed.2d 191 (1963).

■ Having determined that this is an action against the sovereign, the sole issue remaining is whether Western can maintain the present action in this court. Resolving that issue, however, is not at all a simple matter. The very fact that the United States is a party defendant to this suit means that the mysterious and, more often than not, confused doctrine of sovereign immunity is inextricably intertwined within every facet of the analysis.[7] The doctrine of sovereign immunity, reduced to its simplest form, prohibits suits against the United States without express Congressional consent.[8] *United States v. Mitchell*, 463

---

**7.** The origin of the doctrine of sovereign immunity is said to be the monarchical notion that because the "King can do no wrong," there exists no reason for him to be sued. *State Insurance Fund v. United States*, 72 F.Supp. 549, 552 (D.N.Y.1947). Whatever the precise origin of the doctrine, there is no dispute that the concept is derived from our English ancestors and has been employed there since the time of Edward the First. *United States v. Lee*, 16 Otto 196, 205, 106 U.S. 196, 205, 1 S.Ct. 240, 247, 27 L.Ed. 171 (1882). Some might find it surprising, then, to learn that the doctrine of sovereign immunity survived here, in a democracy that intentionally and violently broke faith with its predecessor monarchy. But the doctrine did survive, although it received somewhat of a late recognition. It was not until 1834 that it actually became the letter of the law in this country that the United States could not be sued without express Congressional consent. *United States v. Clarke*, 33 U.S. (8 Pet.) 436, 443, 8 L.Ed. 1001 (1834). However, the reasons for the survival

of the doctrine, or the "spirit of the law," were not articulated until many years later. In 1868, the Supreme Court stated that the purpose for the doctrine of sovereign immunity is to prevent litigation from interfering with public acts that are essential to govern the Nation. *Nichols v. United States*, 74 U.S. (7 Wall.) 122, 126, 19 L.Ed. 125 (1868). *See also United States v. Lee*, 16 Otto 196, 106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171 (1882).

**8.** Suffice it to say that there are over 4000 reported cases in which the courts have discussed the doctrine of sovereign immunity in various contexts. Of note are cases in which the Supreme Court has expressed "disfavor" with the sovereign immunity defense, *Federal Housing Administration v. Burr*, 309 U.S. 242, 245, 60 S.Ct. 488, 490, 84 L.Ed. 724 (1940), and mandated that the doctrine be construed liberally, *United States v. Yellow Cab Co.*, 340 U.S. 543, 550, 71 S.Ct. 399, 404, 95 L.Ed. 523 (1951). It appears that the reason for the askance view of the

U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). But the doctrine of sovereign immunity has been construed to mean far more than mere Congressional consent. Congress can also delineate the precise terms and conditions under which the United States can be sued, including the relief that may be granted and the forum in which the claim may be heard. *Minnesota v. United States*, 305 U.S. 382, 388, 59 S.Ct. 292, 295, 83 L.Ed. 235 (1939); *Jesko v. United States*, 3 Cl.Ct. 730 (1983).

Because of the pervasive nature of the doctrine of sovereign immunity, the parties here, either expressly or impliedly, have raised questions concerning jurisdiction over the "person" of the United States, questions going to the nature and substance of the asserted claims, questions regarding the subject matter jurisdiction of this court, and questions as to what is the proper period of time in which the plaintiff is allowed to bring its claims against the United States.[9] To determine whether Western can maintain its present action, therefore, this court will address each of the following sub-issues:

a) Whether Congress has consented to a damage claim against the United States for the DOI's alleged violations of the EPAA regulations;

b) Whether Western has demonstrated that the source of substantive law it relies

defense is the belief that the doctrine of sovereign immunity is contrary to the concept that individuals should have a remedy for every legal wrong, even if it is committed by the government. *See United States v. Lee*, 106 U.S., at 205–10, 1 S.Ct. at 247–52; *Hartke v. Federal Aviation Administration*, 369 F.Supp. 741, 745 (E.D.N.Y.1973). As long age as 1861, President Lincoln, in his State of the union message, announced that "[i]t is as much the duty of the Government to render prompt justice against itself, in favor of citizens, as it is to administer the same between private individuals." (quoted in Cong. Globe, 37th Cong., 2d Sess., Pt. IV, App. at 2 (1962)).

Since the judicial adoption of the doctrine in this country, the Supreme Court cases have not been at all consistent in interpreting sovereign immunity issues, whether it be liberally or otherwise. The dissenting opinion in *Larson v. Domestic & Foreign Corporation*, 337 U.S. 682,

on, § 210, can be interpreted as requiring money damages from the United States;

c) Whether Congress has vested subject matter jurisdiction in the United States District Courts to hear Western's damage claims against the United States for amounts in controversy that exceed $10,-000; and

d) What did Congress intend to be the applicable period of limitations for Western's damage claims against the United States.

## A. CONSENT TO DAMAGE CLAIM

■ As noted earlier, the traditional doctrine of sovereign immunity requires Congressional consent before the United States can be sued. Congressional consent must be express and unambiguous. *United States v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969). To find express consent to Western's' present claims against the United States, both Western and the DOI focus this court's attention solely on § 210, the private right of action section of the EPAA. Western contends that § 210 supplies the necessary waiver of sovereign immunity and cites several cases in support of its contention. The DOI argues that no express waiver of sovereign immunity can be found in § 210 and relies on a different line of cases to support its argument.

69 S.Ct. 1457, 93 L.Ed. 1628 (1949), written by Justice Frankfurter, represents an heroic attempt to categorize, discuss and justify the inconsistencies. *Id.* at 705, 69 S.Ct. at 1469.

Obviously, this court cannot and need not consider all 4000 reported cases in order to decide this one. In undertaking to construe and apply the doctrine of sovereign immunity in the present controversy, this court will necessarily address some of decisions in an attempt to resolve some of the confusion.

9. In its present motion, the United States has questioned directly only its "consent to suit" and the appropriate statute of limitations to be applied *if it has consented to be sued*. However, because of the expansive nature of the sovereign immunity defense, virtually all issues not directly related to the actual merits of plaintiffs claims are necessarily "jurisdictional" issues and must be resolved by the court.

■ After careful review of the parties' arguments and the cases cited in support of each, it appears that the parties are mistaken in their analytical approach to the question and in their reliance on cases construing the meaning of § 210 as it may or may not relate to the issue of express waiver of sovereign immunity. Section 210 does not provide an *express* waiver of sovereign immunity, nor need it do so. In accordance with the recent Supreme Court ruling in *United States v. Mitchell (Mitchell II)*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) [10] this court finds that the Tucker Act, 28 U.S.C. §§ 1346(a)(2) & 1491(a)(1) serves as the necessary express waiver of sovereign immunity for Western's claims against the DOI.

Because there is a great deal of confusion surrounding the proper approach to be used in addressing the issue of sovereign immunity, the *Mitchell II* holding will be presented in some detail, followed by a discussion of the cases relied on by the parties for their assertions that § 210 does or does not constitute a waiver of sovereign immunity for damage claims founded on the EPAA.

In *Mitchell II*, the Supreme Court devoted considerable attention to clarifying the generally confused notion that a party must show that a particular statutory source creates both a substantive right to money damages and also contains an express waiver of sovereign immunity. The Court emphasized that the concepts of "express consent to suit" and "substantive right to sue" are analytically distinct. Each, therefore, may have its own authoritative source. 103 S.Ct., at 2969. The

Supreme Court found that when Congress passed the Tucker Act, Congress intended that it serve as the source of a broad waiver of sovereign immunity for damage suits against the United States founded upon the types of claims specified in the Tucker Act. *Id.*

■ The Tucker Act, which also grants federal courts jurisdiction [11] over certain categories of claims against the United States, expressly lists claims "founded either upon the Constitution, or any act of Congress, or any regulation of any executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages not sounding in tort." 28 U.S.C. §§ 1346(a)(2) & 1491(a)(1). The Court in *Mitchell II*, after detailing the history of the Tucker Act and quoting extensively from the legislative history, stated in no uncertain terms that

[i]f a claim falls within [the Tucker Act] category, the existence of a waiver of sovereign immunity is clear.... Because the Tucker Act supplies a waiver of immunity for claims of this nature, the separate statutes and regulations [creating a substantive right to money damages] need not provide a second waiver of sovereign immunity, nor need they be construed in the manner appropriate to waivers of sovereign immunity. [cite omitted] "The exemption of the sovereign from suit involves hardship enough where consent has been withheld. We are not to add to its rigor by refinement of construction where consent has been announced." [cites omitted.]

**10.** This litigation includes two Court of Claims opinions and two Supreme Court opinions: *Mitchell I* consists of the Court of Claims decision at 591 F.2d 1300, 219 Ct.Cl. 95 (1979), and the Supreme Court decision at 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980). *Mitchell II* in the Court of Claims is found at 664 F.2d 265, 229 Ct.Cl. 1 (1981).

**11.** The Tucker Act, 28 U.S.C. §§ 1346(a)(2) & 1491(a)(1), gives the Claims Court, formerly the Court of Claims, and the United States District Courts concurrent jurisdiction to hear damage claims against the United States for amounts in controversy not exceeding $10,000. The Claims Court has jurisdiction to hear damage claims against the United States, regardless of amount in controversy. *See* Section II C of this opinion

*Id.* at 2969.[12]

Cases decided since *Mitchell II* confirm the Supreme Court's expansive interpretation of the meaning and scope of the Tucker Act as it relates to an general waiver of sovereign immunity for damage claims against the government. If a plaintiff asserts a damage claim against the United States that falls within a Tucker Act category, consent to suit is simply a non-issue. *See Short v. United States,* 719 F.2d 1133, 1135 (Fed.Cir.1983); *N.A. Corp. of Washington v. United States,* 5 Cl.Ct. 52, 56 (1984); *Anderson v. United States,* 5 Cl.Ct. 573, 576 (1984); *Cape Fox Corp. v. United States,* 4 Cl.Ct. 223, 230 (1983); *Hohri v. United States,* 586 F.Supp. 769, 781 (D.D.C.1984).

The threshold question here, then, is not whether the private right of action section in the EPAA provides an express waiver of sovereign immunity, but whether Western's claims fall within the Tucker Act category. Because Western is asking for money damages based on the DOI's violations of regulations promulgated pursuant to the EPAA, there can be no dispute that Western has asserted a damage claim against the United States that is founded on an Act of Congress and on executive regulations. Western's claims fall squarely within the Tucker Act category, and the United States has presumptively consented to be sued.

It is important to note that the *Mitchell II* Court, in holding that the Tucker Act is a broad waiver of sovereign immunity for damage claims against the United States, expressly admonished that any language in prior cases suggesting the contrary "should be disregarded." *Id.,* 103 S.Ct. at 2967. Thus, to the extent that the parties here rely on cases that expressly or impliedly hold that the Tucker Act does not serve as a source of consent to sue the government for claims founded on the EPAA, this court must disregard those cases.

After examining each of the cases that both Western and the DOI cite in support of their "consent to suit" arguments, it is clear that the courts in those cases searched for a waiver of sovereign immunity only in § 210. Because the courts in those cases did not consider the Tucker Act as a possible source of consent to sue the United States for actions founded on the EPAA, the language in those cases relating to the issue of waiver of sovereign immunity is not persuasive.[13] *See Glenrock Refinery, Inc. v. Department of Interior,* Civ. No. C84-264B (D.Wyo. Dec. 5, 1984); *Wyoming Refining Company v. Department of Interior,* 547 F.Supp. 297 (D.Wyo. 1982), and *Tipperary Refining Company v. Department of Interior,* Civ. No. MO-84-CA-05 (W.D.Tex., Jan. 16, 1985) cited in support of Western's contention that § 210 constitutes a waiver of sovereign immunity. *See also Griffin v. United States,* 537 F.2d 1130 (TECA), *cert. denied,* 429 U.S. 919, 97 S.Ct. 313, 50 L.Ed.2d 286 (1976) and *McCulloch Gas Processing Corp. v. Canadian Hidrogas, etc.,* 577 F.2d 712 (TECA), *cert. denied* 439 U.S. 831, 99 S.Ct. 109, 58 L.Ed.2d 126 (1978) for the DOI's contention that § 210 does not constitute a waiver of sovereign immunity for Western's claims.

for a discussion of this court's subject matter jurisdiction to hear the present claims.

**12.** The factual controversy in both *Mitchell I* and *Mitchell II* involved the attempts of individual allottees of Indian Reservation land to recover damages against the United States for alleged mismanagement of timber resources. After finding that the Tucker Act provides the United States' consent to suit for claims founded on a statute or regulation, the Court examined several statutes and regulations that plaintiffs asserted created a substantive right to money damages. The Court found that because the statutes and regulations created a fiduciary obligation of the government, they could fairly be interpreted as mandating compensation for the damages sustained.

**13.** In light of the *Mitchell II* holding, and the Supreme Court's approach to the issue of sovereign immunity, the cases cited by Western and the DOI are simply inapposite. In so finding, however, this court in no way questions the result in any of the cases. *See* section II B of this opinion for a discussion of the applicability of the cited cases to the issue of substantive right to sue.

At this point, before addressing the issue of whether Western can demonstrate a source of law creating a substantive right to sue, it may be useful to review the cases decided by the Temporary Emergency Court of Appeals, *supra,* because those cases are particularly illustrative of at least part of the reason why confusion arose as to the distinction between consent to suit and substantive right to sue, and because those cases also directly concern the interpretation of § 210 and the EPAA.

In *Griffin,* 537 F.2d 1130, a group of royalty oil interest owners filed suit against the United States for damages allegedly suffered as a result of the imposition and operation of the EPAA's two-tiered pricing regulations on crude oil. The plaintiffs alleged that the operation of those regulations constituted a partial "taking" of their property for public purposes for which they were entitled to compensation pursuant to the Fifth Amendment. On appeal to the Temporary Emergency Court of Appeals (TECA), the government questioned the district court's "jurisdiction" to hear the claims, without specifying the particular jurisdictional defect. The government argued, in the alternative, that there had been no taking. Although the TECA ultimately found that under the narrow facts of the case, no compensable "taking" had occurred, it did conclude that the district court had jurisdiction over plaintiffs' constitutional claims. 537 F.2d at 1136. While the district court had held that it had jurisdiction by virtue of the Tucker Act and § 210(a) of the ESA., *Id.* at 1132, the TECA focused primarily on §§ 210 and 211 of the ESA. It found that those sections gave a harmonious treatment to the issues of jurisdiction and the right to sue. *Id.* at 1135–36. The TECA concluded that:

> ... if or to the extent plaintiffs suffered legal wrong because of any taking of their property as a result of the two-tier oil pricing system, they would have the right to utilize the jurisdiction afforded in the district court by § 211 by bringing the type of action contemplated by 210(a)

for damages, there being no limitations in § 211 to the contrary.

*Id.* at 1136.

It is worthy to note, here, that the *Griffin* court did not have before it, and thus did not expressly discuss the issue of "consent to sue" the United States. The *Griffin* case holds only that § 210 granted plaintiffs a substantive right to claim damages for the government's actions and that § 211 empowered the district court to hear the controversy.

At almost the same moment that *Griffin* was decided, the Supreme Court issued its opinion in *United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). It is the reasoning and language in *Testan* that serves as the admitted source of confusion between "consent to sue" and "substantive right to sue" seen in later cases decided by the TECA. *See Mitchell II,* 103 S.Ct. at 2967.

In *Testan,* the Court was confronted with a suit against the government for reclassification and upgrading of federal civil service positions and for an award of money damages for back pay. The government employees argued that the Tucker Act supplied the necessary consent to sue the United States and that both the Reclassification Act and the Back Pay Act afforded the employees a substantive right to claim money damages. 424 U.S., at 400–01, 96 S.Ct. at 954. The *Testan* Court was not persuaded by the employees approach to the issue. *Id.* at 400, 96 S.Ct. at 954. The Court found that the Tucker Act was "merely jurisdictional" and that waivers of sovereign immunity and grants of rights of actions must be made with specificity. *Id.* The Court was also unpersuaded that the *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974) were authority for the proposition that the Tucker Act eliminates from consideration the sovereign immunity of the United States. The Court reasoned that those cases, which refused to find an implied withdrawal of Tucker Act remedy in the context of a Fifth Amendment "taking" claim, were tied to the "self-executing" as-

pects of the Fifth Amendment. *Id.*, 424 U.S. at 401, 96 S.Ct. at 954. The *Testan* Court then required that the language of either the Classification Act or The Back Pay Act contain an express consent by the government to pay for claims of the type that the employees asserted. The Court found no such language and ordered the case dismissed.[14]

Based on the reasoning and language in *Testan*, the TECA subtly but significantly altered the scope and meaning of the *Griffin* holding when the issue of suits against the government arising out of EPAA regulation came before it again in the *McCulloch* case, 577 F.2d 712. In that case, McCulloch filed suit against Hidrogas for $900,000 which it claimed was due for sales of propane. McCulloch also named the Regional Administrator of the Federal Energy Agency (FEA)[15] as a defendant on the grounds that the FEA was responsible for the $900,000 debt because the imposition of the FEA's regulations required McCulloch to continue selling propane to a purchaser with a poor credit rating and a history of financial delinquency. McCulloch defended its right of action against the United States, citing *Griffin.*

Whereas it did not do so in *Griffin*, in *McCulloch* the government specifically raised the bar of sovereign immunity. Because that issue was squarely before the court this time, the TECA had no choice but to reconcile its holding in *Griffin* with the Supreme Court pronouncements in *Testan.*

In doing so, the TECA understandably relied heavily on the language and reasoning of the *Testan* Court. The TECA clearly interpreted *Testan's* holding as requiring statutes creating a substantive right to money damages to be construed in the

manner appropriate to waivers of sovereign immunity. *Id.* at 716–17. As such, the TECA ignored the Tucker Act as a source of consent to sue the United States, undoubtably because the *Testan* court seemed to make it clear that the Tucker Act was "merely jurisdictional." Also in accordance with *Testan*, the TECA explained that the waiver of sovereign immunity in *Griffin* was implicit in the Fifth Amendment, and the holding, therefore, could not be used as authority to the effect that § 210 eliminates from consideration the sovereign immunity of the United States. *Id.* at 716. The TECA then turned to the language and history of § 210 in search of both a waiver of sovereign immunity and a substantive right to money damages. In failing to find an appropriate waiver, either express or implied, the TECA rejected McCulloch's "invitation to extend *Griffin* beyond the limits of the taking clause of the Fifth Amendment." *Id.* at 718.

Given that lengthy, but nonetheless necessary, review of the *Griffin-McCulloch* line, it is clear that those cases cannot serve as authority for the DOI's present argument that the United States has not consented to Western's suit against it. There is no doubt that the *Griffin-McCulloch* line is explicit progeny of *Testan.* And in *Mitchell II,* the Supreme Court expressly stated that any language in *Testan* suggesting that the Tucker Act does not serve as a broad waiver of sovereign immunity "should be disregarded." 103 S.Ct. at 2967.

The DOI points to no persuasive authority for its contention that the United States has not consented to Western's claims against it. This court finds that the *Mitchell II* holding is dispositive of the "consent to sue" issue under the facts of this case.

---

**14.** The Court could find "no provision in the Classification Act that expressly makes the United States liable for pay lost through allegedly improper classifications." 424 U.S. at 399, 96 S.Ct. at 953. The Court found that although the Back Pay Act expressly allowed retroactive recovery of wages in some instances, a wrongful classification claim was not one of those instances. *Id.* at 405, 96 S.Ct. at 956.

**15.** On October 1, 1977, pursuant to the Department of Energy Organization Act, P.L. 95–91 and Executive Order 12009, 42 Fed.Reg. 46267 (Sept. 13, 1977), the FEA became part of the newly established Department of Energy.

## B. SUBSTANTIVE RIGHT TO SUE

■ That the government may have consented to be sued for claims founded on the EPAA does not mean that the inquiry is at an end. The Tucker Act "does not create any substantive right enforceable against the United States for money damages" *Mitchell II*, 103 S.Ct. at 2967, quoting *Testan*, 424 U.S., at 398, 96 S.Ct. at 953. Western must point to some other source of law that "can fairly be interpreted as mandating compensation by the federal government for the damages sustained." *Mitchell II*, 103 S.Ct. at 2968, quoting *Testan*, 424 U.S., at 400, 96 S.Ct. at 954.

■ Western primarily seeks recovery of alleged overcharges by the DOI for royalty crude oil it sold to Western in violation of the existing pricing regulations. This court finds that Western appropriately relies on § 210 for its substantive right to obtain money damages.

As noted before, § 210 is the private right of action section found in the EPAA.[16] Section 210(a) plainly creates a cause of action for damages for "[a]ny person suffering legal wrong because of any act or practice arising out of the [EPAA]." Section 210(b) specifically contemplates claims for "overcharges". There is· nothing in the language of § 210 that directly includes or excludes damage suits against the United States. The United States is not mentioned in that section.

■ As was emphasized in *Mitchell II,* in inquiring whether the source of substantive law can fairly be interpreted as mandating compensation by the federal government for the damages sustained, a court need not find a separate waiver of sovereign immunity, nor need the court construe the statute or regulation in a manner appropriate to waivers of sovereign immunity. *Mitchell* 103 S.Ct. at 2968–69. In the context of the present suit, it is proper to interpret § 210 as creating a right to recover money damages against the United States, even though such right is not explicitly set forth. *Anderson v. United States*, 5 Cl.Ct. 573, 577 (1984).

■ In determining whether § 210 can be interpreted as mandating compensation from the government for damages sustained, it is helpful to note what the United States was *required* to do under the EPAA and regulations issued thereunder. There is simply no question that the DOI was subject to the EPAA pricing regulations. The FEA specifically promulgated a regulation, found at 10 C.F.R. § 212.52 which provides:

> The prices charged for any sale of a covered product by any Federal department, agency or other instrumentality, including any wholly owned Government corporation ... are subject to the price regulations of this part.

The federal government's compulsory compliance with the price control regulations has been repeatedly affirmed by the DOE, Interp. No. 75–15. CCH *Compliance Manual* ¶ 52,256 at 56,281 (Mar. 20, 1975)) and by the Temporary Emergency Court of Ap-

---

**16.** Section 210 reads in relevant part:

(a) Any person suffering legal wrong because of any act or practice arising out of this title, or any order or regulation issued pursuant hereto, may bring an action in a district court of the United States, without regard to amount in controversy, for appropriate relief, including any action for a declaratory judgment, writ of injunction (subject to the limitations in section 211), and/or damages.

(b) In any action brought under subsection (a) against any person renting property or selling goods or services who is found to have overcharged the plaintiff, the court may, in its discretion, award the plaintiff reasonable attorney's fees and costs, plus whichever of the following sums is greater:

(1) an amount not more than three times the amount of the overcharge upon which the action is based, or

(2) not less that $100 or more than $1,000; except that in any case where the defendant established that the overcharge was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to the avoidance of such error the liability of the defendant shall be limited to the amount of the overcharge ...

(c) For the purpose of this section, the term "overcharge" means the amount by which the consideration for the rental of property or the sale of goods or services exceeds the applicable ceiling under regulations or orders issued under this title.

peals, *Mohawk Petroleum Corp. v. Dep't of the Navy*, 521 F.2d 1394 (TECA 1975). Moreover, in a January, 1977 Decision & Order issued directly to the DOI, the FEA strongly emphasized that even the existence of conflicting agency regulations should not result in an interpretation that the DOI was exempt from mandatory compliance with the royalty crude oil price regulations.[17]

Given the express mandate that that federal agencies comply with the EPAA price regulations, it is illogical to suggest that federal agencies should then be exempt from liability under the only substantive enforcement clause of the Act.

Other courts that have addressed the precise issue that is before this court—whether the United States can be held liable for money damages under § 210 for royalty crude oil overcharges—have answered the question in the affirmative. In doing so, they have interpreted § 210 as mandating compensation by the federal government for the damages sustained. *Glenrock Refinery, Inc. v. Department of Interior*, Civ. No. C84–264B (D.Wyo. Dec. 5, 1984); *Wyoming Refining Company v. Department of Interior*, 547 F.Supp. 297 (D.Wyo.1982), and *Tipperary Refining Company v. Department of Interior*, Civ. No. MO–84–CA–05 (W.D.Tex., Jan. 16, 1985).

In finding that overcharge suits against the DOI were not precluded, the court in *Wyoming Refining*, 547 F.Supp. 297, seemed to place some importance on the fact that in selling the crude oil, the government was not exercising any type of uniquely governmental act, but merely was in the business of selling oil. The court's holding is particularly well-stated:

In the case at hand, the conduct giving rise to the cause of action [under the EPAA] and the legal theory on which recovery is based are identical to that which was envisioned by the authors of the enforcement mechanism designed to give effect to the ESA. The federal government was explicitly included within that apparatus by 10 CFR §§ 212.31 and 212.52. To exempt one of the largest sellers of crude oil from the pricing mechanism by precluding purchasers from pursuing their statutory remedies for overcharges would be incongruent with that regulatory scheme.

*Id.* at 300.

The court in *Wyoming Refining* recently had the opportunity to re-evaluate its decision when a similar case came before it. In *Glenrock Refinery, Inc. v. Department of Interior*, *supra* the court reaffirmed its prior holding that overcharge suits against the DOI were not precluded.[18] The court

---

**17.** The FEA Decision and Order states in relevant part;

Although the Department of the Interior Regulations concerning royalties owed to the United States ... provide for the payment of not less that 12½% of the gross proceeds from a lease as royalty payment, these regulations can be superceded by an FEA determination that the federal interest will be furthered by requiring the royalty payment to the USGS to be limited by the pricing provisions of the EPAA.... *The FEA has made this decision in the present case.*

⋅ ⋅ ⋅ ⋅ ⋅

Since the USGS has failed to demonstrate that it is incurring any hardship or inequity as a result of the FEA Pricing Regulations, the extension of exception relief for the USGS would be in *direct contravention of an express Congressional directive.* [emphasis added.]
*United States Geological Survey*, 5 FEA ¶ 80,537 at 80,576–77.

**18.** The court in *Glenrock Refinery* found that its holding in *Wyoming Refining* is further supported by legislative history accompanying the recently enacted Federal Oil and Gas Royalty Management Act of 1982, P.L. 97–451 (1–12–83), codified at 30 U.S.C. §§ 1701–1757 (1983 Supp.). The court noted that the Secretary of the Interior had unsuccessfully sought to enact a provision to that Act that would have retroactively exempted the DOI from mandatory compliance with the EPAA pricing regulations and would have prohibited damage claims against the United States for alleged non-compliance with the regulations. *See* "SECRETARY'S INDEPENDENT AUTHORITY TO COLLECT ROYALTY", Sec. 12, S.Rep. No. 512, 97th Cong., 2d Sess. at pp. 11, 41. The court also noted statements made by various members of Congress which the court believed showed that Congress had intended the United States and its agencies and officials to be subject to damage actions under § 210 of the ESA, as incorporated in the EPAA. *See* S.Rep. No. 512, at pp. 20, 56–60; *Hearings*

in *Tipperary Refining, supra,* reached the same result, albeit without significant explanation.[19]

This court is not persuaded by the DOI's reliance on *McCulloch,* 577 F.2d 712, for the proposition that § 210 cannot fairly be interpreted as mandating compensation by the federal government in this case. As noted earlier, in *McCulloch,* plaintiff brought suit for damages it allegedly suffered as a result of the government's *enforcement* of the regulatory requirements. Under those circumstances, the TECA properly found that § 210 could not fairly be interpreted as mandating compensation because "to expose the FEA to damage actions based on its regulations and orders would constitute a highly unusual choice by Congress ..." *Id.* at 717. This court does not disagree with that contention nor does it question the result in *McCulloch.*

But here we have a very different situation. Western alleges that the DOI *violated* regulations that it was expressly required to adhere to as a seller of crude oil. Whereas in *McCulloch* the United States agency was wearing its "governmental hat" when it acted *in accordance* with Congressional mandates, here the United States agency was wearing its "proprietary hat" when it acted *contrary* to Congressional mandates. *Wyoming Refining,* 547 F.Supp. at 299–300. That distinction is a distinction of some importance.

It seems that when attempting to wrestle with the notion of the federal government's immunity from suit, there is a common

tendency to fail to consider the purpose of the defense. In one of the first cases in which the Supreme Court addressed the purpose of the defense of sovereign immunity, the Court stated that "but for the protection which sovereign immunity affords, the government would be unable to perform the various duties for which it was created." *Nichols v. United States,* 74 U.S. (7 Wall.) 122, 126, 19 L.Ed. 125 (1868). In short, the stated purpose of the doctrine is to protect *government functions,* not merely to protect the government. Only occasionally, has that purpose been acknowledged by the courts. *Larson v. Domestic & Foreign Corporation,* 337 U.S. 682, 704, 69 S.Ct. 1457, 1468, 93 L.Ed. 1628 (1949); *McCulloch,* 577 F.2d, at 717; *Wyoming Refining,* 547 F.Supp., at 299–300.

There seems to be no really good reason why consideration of the purpose of the sovereign immunity defense is noticeably absent from much of the case law pertaining to the immunity of the United States. The governmental function/proprietary function distinction has long been important when determining the extent of State immunity. *See generally,* Annot., 40 A.L. R.2d 927 (1955). The governmental function/proprietary function distinction has been codified by Congress with regard to Foreign government immunity. *See* 28 U.S.C. § 1602 et seq. (1976). If valid in those contexts, the distinction should be no less important when considering the sovereign immunity of the United States.[20]

---

*Before the Committee on Energy and Natural Resources, United States Senate,* 97th Cong., 3d Sess. on S.2305, at p. 292. *See Glenrock Refinery Inc. v. Department of Interior,* Civ. No. C84–264B (D.Wyo. Dec. 5, 1984).

**19.** The court in *Tipperary Refining* quoted the requirement that the statute upon which plaintiff sues must be interpreted as mandating compensation by the Federal Government for the damage sustained. Without discussion, the court then concluded that § 210 and 211 provided a foundation for plaintiff to bring the overcharge claims. *Tipperary Refining Company v. Department of Interior,* Civ. No. MO–84–CA–05 (W.D.Tex., Jan. 16, 1985).

**20.** The DOI-asserts that the Supreme Court has emphatically rejected the governmental function/proprietary function distinction for claims against the United States. The DOI, in support of its assertion, cites *Rayonier, Inc. v. United States,* 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957) and *Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955). The language that the DOI refers to in those cases has to do with the Court's emphatic *rejection* of the government's attempts to limit its liability under the Federal Tort Claims Act. Thus, it would be difficult to construe that language to support the government's attempt to limit its liability, here. *But see, Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947).

Taking all of the above into consideration, with no single factor controlling, this court finds that § 210 can fairly be interpreted as requiring compensation by the United States for the DOI's alleged violation of the EPAA price regulations.

## C. SUBJECT MATTER JURISDICTION

The fact that the United States has consented to be sued for damage claims founded upon the EPAA, and the fact that Western has shown that § 210 can be construed to provide it with a substantive right to sue the United States, does not necessarily mean that this court has subject matter jurisdiction to entertain Western's claims. Congress may determine not only whether the United States may be sued, but also Congress may determine in what courts the suit may be brought. *Minnesota v. United States,* 305 U.S. 382, 388, 59 S.Ct. 292, 295, 83 L.Ed. 235 (1939); *Konecny v. United States,* 388 F.2d 59, 62 (8th Cir.1967).

The Tucker Act, in addition to being an express waiver of sovereign immunity for certain damage claims against the United States, is a jurisdictional statute. It provides for suits against the United States in either the district courts or the Claims Court for damage claims that do not amount to more than $10,000. 28 U.S.C. §§ 1409, 1346. If the amounts in controversy are determined to exceed $10,000, generally only the Claims Court can hear the action. Western's claims, however, arise under the EPAA, which contains its own jurisdictional provision. Section 211 vests the United States District Courts with exclusive jurisdiction for suits arising under the EPAA, regardless of amount in controversy.[21]

The conflict is obvious and can be stated simply. The Tucker Act vests the Claims Court with *exclusive* jurisdiction of damage actions against the United States in excess

of $10,000. Section 211 of the EPAA vests the district courts with *exclusive* jurisdiction for all claims arising under the EPAA, regardless of amount in controversy. The controversy at bar is a damage action against the United States that is in excess of $10,000 *and* is one that arises under the EPAA. It is an action over which Congress has given both the district court and the Claims Court exclusive jurisdiction. Obviously, simple logic dictates that two different courts cannot successfully assert exclusive jurisdiction over the same action. Therefore, it is necessary to examine the two jurisdictional statutes in an attempt to reconcile the conflict.

One possible interpretation is that the two statutes limit each other's jurisdiction, in part, such that *no* court would have jurisdiction over a claim arising under the EPAA against the United States if the claim was greater than $10,000. In other words, enactment of § 211 may have effected a repeal of an otherwise valid Tucker Act remedy.[22]

There appears to be no express mention of the Tucker Act in either the language of the EPAA or the ESA or in any of the legislative history proceeding those two acts. Thus, to find that a Congressional grant to the district courts of exclusive jurisdiction for claims arising under the EPAA constitutes a blanket withdrawal of an otherwise valid Tucker Act remedy, would require a finding of repeal by implication.

The Supreme Court has historically rejected *sub silentio* repeal or amendment and has required that the legislative intent to repeal a statute be clear and manifest. *Watt v. Alaska,* 451 U.S. 259, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981); *City and Cty. of Denver, etc. v. Bergland,* 695 F.2d 465 (10th Cir.1982). The Supreme Court has expressly rejected implied repeal of a Tuck-

---

**21.** § 211 Judicial Review

(a) The district courts of the United States shall have exclusive original jurisdiction of cases or controversies arising under this title, or under regulations or orders, issued thereunder, notwithstanding the amount in controversy.

**22.** Absent the exclusive jurisdiction language in § 211, there is no doubt that Western could pursue its damage claims against the DOI that are in excess of $10,000 in the Claims Court. *McCullough,* 577 F.2d 712, 715 (TECA 1978).

er Act remedy. *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974).

 Moreover, it would be illogical to imply such a repeal. There is no apparent conflict for amounts in controversy that are less that $10,000; nothing in the Tucker Act or § 211 would prevent Western from bringing its present claims against the DOI in this court if the claims did not exceed $10,000. It simply makes no sense at all for Congress to provide a damage remedy to persons who the government injures in an amount less than $10,000, and to deny a damage remedy to persons who the government injures in an amount greater than $10,000. An interpretation of a statute which would produce absurd results is to be avoided if alternative interpretations, consistent with the legislative purposes of the acts, are available. *Griffin v. Oceanic Contractors Inc.,* 458 U.S. 564, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982).[23]

 A more rational interpretation of the effect of the language in § 211 would be that § 211, a recent, specific enactment, creates an exception to the jurisdictional amount limitation in the Tucker Act, a general enactment. That interpretation is one that is consistent with established rules of statutory construction. Generally, when a court is forced to choose which of two contradictory statutes to enforce, the court may decide that the later, more specific statute is an exception to the earlier, more general one. *Busic v. United States,* 446 U.S. 398, 406, 100 S.Ct. 1747, 1752, 64 L.Ed.2d 381 (1982); *Watt v. Alaska,* 451 U.S. 259, 266, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981); *Chevron U.S.A., Inc. v.*

*Hammond,* 726 F.2d 483 (9th Cir.1984); *Stewart v. Smith,* 673 F.2d 485, 492 (D.C. Cir.1982); *Chemical Mfr's Ass'n v. Environmental Protection Agency,* 673 F.2d 507, 512 (D.C.Cir.1982).

It would be consistent with the legislative purposes of both the EPAA and the Tucker Act to interpret § 211 as creating a narrow exception to the jurisdictional amount limitation of the Tucker Act. In incorporating §§ 210 and 211 in the EPAA, Congress unequivocally intended to provide both a remedy for and a deterrence against violations of the price regulations. *Ashland Oil Co. of California v. Union Oil Co. of California,* 567 F.2d 984, 990 n. 11 (TECA 1977), *cert. denied,* 435 U.S. 994, 98 S.Ct. 1644, 56 L.Ed.2d 83 (1978). Because the EPAA lacks a comprehensive regulatory mechanism for policing price violations, the integrity of the legislation can be maintained only by allowing every person suffering legal wrong to act as a private Attorney General under §§ 210 and 211. Ready access to the appropriate district court accomplishes that purpose. If a government agency, itself, is the alleged violator, access to the district court should not be barred simply because the government's violations amount to more than $10,-000.[24] The Tucker Act was designed "to give the people of the United States what every civilized nation of the world has already done—the right to go into the courts to seek redress against the Government for their grievances." 18 Cong.Rec. 2680 (1887), (remarks of Rep. Bayne.)

Finally, a finding that § 211 creates an exception to the amount in controversy re-

---

**23.** Another equally illogical interpretation would be to find that Congress did not really mean it when it said that the district courts have exclusive jurisdiction over actions arising under the EPAA, regardless of amount in controversy, but, meant that the Claims Court can hear actions such as the present one. Section 211 is clearly designed to provide speed and consistency of decisions in *all* cases arising under the EPAA. *Gulf Oil Corp. v. Department of Energy,* 514 F.Supp. 1019, 1023–24 (D.D.C.1981). Finding that the Claims Court should hear such actions as the present one, would be in derogation of the plain meaning of the § 211, a

statute that is more specific and of later date than the Tucker Act.

**24.** It is no longer Congressional policy to restrict large claims against the United States to Claims Court disposition. For example, the district courts have exclusive jurisdiction to hear all cases against the United States brought pursuant to the Federal Tort Claims Act. It is common knowledge that many, if not most, of the FTCA claims are for amounts in controversy that exceed $10,000.

quirement also is consistent with language in TECA opinions that have commented on this obvious conflict. In *Griffin*, 537 F.2d 1130, plaintiffs argued that § 211 operates to waive the jurisdictional amount limitation of the Tucker Act. *Id.* at 1134. The TECA found that the district court had jurisdiction to hear plaintiffs claims, including those that were in excess of $10,000. It did so by granting that plaintiffs were correct in asserting that § 211 removes the jurisdictional amount bar of the Tucker Act and by finding that § 211 serves the more basic purpose of establishing the overall jurisdiction of the courts involved. *Id.* at 1135. *See also McCulloch*, 577 F.2d 712, 715–16 (TECA 1978).

In conclusion, this court finds that it has subject matter jurisdiction to hear the present claim against the United States, regardless of the amount in controversy.

### D. STATUTE OF LIMITATIONS

 The final question that must be answered is what is the appropriate period of limitations of actions to which the United has consented to be sued. The DOI asserts that this court should apply state statutes of limitation. Western counters that the only statute of limitations applicable to its particular civil action against the DOI is 28 U.S.C. § 2401(a). This court agrees with Western.

 Congress did not specifically set forth a limitations provision in either the EPAA or the ESA. If both parties to this action were private parties, it is well established that this court would be compelled to apply the most analogous state law of limitations. *Runyon v. McCrary*, 427 U.S. 160, 179–80, 96 S.Ct. 2586, 2598–99, 49 L.Ed.2d 415 (1976); *Ashland Oil Co. of California v. Union Oil Co. of California*, 567 F.2d 984, 989 (TECA 1977), *cert. denied* 435 U.S. 994, 98 S.Ct. 1644, 56 L.Ed.2d 83 (1978). But both parties to this action are not private parties: the United States is the defendant to this civil action.

28 U.S.C. § 2401(a) provides in relevant part that:

> every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues.

For nearly 100 years, § 2401(a) has served as the general statute of limitations applicable to non tort claims[25] against the government, whether those claims be in law or in equity. *See Crown Coat Front Co. v. United States*, 363 F.2d 407, 411–12 (2d Cir.1966), *rev'd on other grounds* 386 U.S. 503, 87 S.Ct. 1177, 18 L.Ed.2d 256 (1967), *citing United States v. Greathouse*, 166 U.S. 601, 17 S.Ct. 701, 14 L.Ed. 1130 (1897) and *Finn v. United States*, 123 U.S. 227, 85 S.Ct. 82, 31 L.Ed. 128 (1887). *See also* Wright, Miller & Cooper, *Federal Practice and Procedure* § 3654, n. 14 and cases cited therein.

In *Saffron v. Department of the Navy*, 561 F.2d 938 (D.C.Cir.1977), the court distinguished suits between private parties in which federal courts will borrow analogous state laws of limitations, from suits against the United States. In doing so, the court articulated the meaning and applicability of § 2401(a):

> [C]ongressional silence was accepted as a reflection of federal policy to abide non federal statutes of limitations applicable in analagous situations.... Suits against the United States—... however, comprise one of the special categories of litigation for which Congress has erected a time barrier. Section 2401(a) specifies that '[e]very civil action commenced against the United States shall be barred unless a complaint is filed within six years after the right of action first accrues.' *This mandate is but an exertion of the undoubted congressional power to impose restrictions upon the institution of litigation authorized against the Federal Government.*

---

**25.** 28 U.S.C. § 2401(b) is the general statute of limitations for tort claims against the United States.

*Id.* at 941 [citations omitted; emphasis added.] Other courts also have noted the distinction between civil actions in which the defendant is a private party and civil actions in which the United States is the defendant. *Stevens v. Tennessee Valley Authority,* 712 F.2d 1047 (6th Cir.1983) (suits against the TVA are not suits against the United States and, thus, are not governed by § 2401(a)); *Pollard v. United States,* 384 F.Supp. 304, 311 (M.D.Alab. 1974) (applying analogous state statute of limitations to federal claim against state defendants and § 2401(a) to federal claim against the United States).

Of particular note is the recent decision in *Glenrock Refinery, Inc. v. Department of Interior,* Civ. no. C–84–0264B, Slip. Op. at 6–7. (D.Wyo. December 5, 1984). On its facts, the *Glenrock Refinery* case is indistinguishable from the case at bar, as plaintiff there had filed a civil action pursuant to § 210 of the ESA to recover overcharges from the DOI for violations of the EPAA pricing regulations. In refuting the DOI's contention that state statutes of limitations should govern, the court in *Glenrock Refinery* noted the decisions in *Saffron* and *Pollard supra* and found that application of the six year limitations period in 28 U.S.C. § 2401(a) was definitive. *Cf. Lunday-Thagard Co. v. United States Department of Interior,* Civ. No. 83–3006, Slip. Op. (W.D.La. February 4, 1985).[26]

It appears that the only situation in which § 2401(a) would not apply to a civil action against the United States is if the action was brought under a federal statute that expressly provides that suits against the United States shall be governed by a shorter or longer limitations period. *See e.g.* 28 U.S.C. § 2401(b) (two-year limitation for tort claims); 26 U.S.C. § 6511(a) (limitations of actions for taxpayer refund claims.) Here, Congress failed to provide an express limitation period in the EPAA or the ESA. This court must presume that Congress was well aware that absent an express limitation period in the EPAA, civil suits filed against the United States would be governed by the general limitations period in § 2401(a). As such, this court must find that the period of limitations provision that governs this action is 28 U.S.C. § 2401(a). The intent is not that Western receive greater rights against the government than it would have against a private party, but rather to to give effect to the long standing axiom that Congress, not the fifty individual states, sets the terms and conditions under which the government can be sued.

## III. CONCLUSION

The recent holding in *Mitchell II* firmly supplants any contention that there is no waiver of sovereign immunity under the facts of this case. The Tucker Act is the only necessary, Congressional consent to suit against the United States for damages, when statutes and regulations create substantive rights to money damages. Section 210 of the ESA, as incorporated in the EPAA, can fairly be interpreted as requiring money damages from the United States for the DOI's alleged violations of the EPAA price regulations. Section 211 of the ESA, as incorporated in the EPAA, and 28 U.S.C. § 1346(a)(2) vest the district courts with subject matter jurisdiction, regardless of amount in controversy, to hear claims against the United States founded on the EPAA. The applicable statute of limitations for claims against the United States founded on the EPAA is the six year provision at 28 U.S.C. § 2401(a).

For all of the above reasons, IT IS ORDERED, that defendants' Motion for Summary Judgment is DENIED.

**26.** In *Lunday-Thagard,* the court denied plaintiff's Motion to Reconsider its earlier decision that state statutes of limitations governed actions against the DOI brought under the private action provision of the EPAA. In denying the Motion, the court emphasized that plaintiff had conceded earlier that 28 U.S.C. § 2401(a) was inapplicable. The court also noted that application of § 2401(a) would be "anathematic to our national goal of deregulating the oil industry." This court does not find the decision in *Lunday-Thagard* persuasive in light of the weight of authority to the contrary.